**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William Michael ELAM, Richard Victor Jennings, Jr., George Anthony Seek and William Lykergus Miller, Jr., Defendants-Appellants.**

No. 81–1042.

United States Court of Appeals, Fifth Circuit.

June 21, 1982.

William M. Ravkind, Dallas, Tex., for Elam.

George R. Milner, Ronald L. Goranson, Dallas, Tex., for Jennings.

Charles Robinson, Charles Louis Roberts, El Paso, Tex., for Seek.

Tom Mills, Elizabeth U. Carlyle, Dallas, Tex., for Miller.

Cheryl B. Wattley, H. Jay Ethington, Asst. U. S. Attys., Dallas, Tex., for the U. S.

Before POLITZ and RANDALL, Circuit Judges, and PARKER *, District Judge.

JOHN V. PARKER, District Judge:

On March 21, 1980, in a single-count indictment filed in the Northern District of Texas, Dallas Division, eighteen persons, including appellants William Michael Elam, Victor Jennings, Jr., and William Lykergus Miller, Jr., were charged with conspiring to import and to distribute imported marijuana and possession of the contraband with intent to distribute it in violation of 21 U.S.C. § 963 and § 846.

Following a jury trial of these four defendants only,[1] guilty verdicts were returned against each of them. The district court denied motions for new trials made by appellants Elam, Jennings and Miller, and all appellants have appealed.[2]

The record on appeal is substantial,[3] and the issues on appeal are numerous, but, after careful examination of the record and legal arguments presented, we conclude that all convictions should be affirmed.

The principal bone of contention in this case is the recurring dispute between prosecution and defense over single versus multiple conspiracies.

The indictment charges that 18 defendants and other persons "known and unknown" to the grand jury conspired to violate 21 U.S.C. § 952(a) by importing large quantities of marijuana from Colombia and Mexico, to violate 21 U.S.C. § 959 by distributing the imported contraband and to violate 21 U.S.C. § 841(a) by possessing marijuana with intent to distribute and distributing it. The conspiracy to violate these statutes is charged as violating 21 U.S.C. § 963 and § 846.

The government contends that this was a single conspiracy beginning in August, 1978, and continuing until July, 1979, involving the acquisition, conversion and use of a DC–6 aircraft and several smaller aircraft, together with necessary flight and ground crews, landing sites, both foreign and domestic, and some subsidiary ventures designed to help finance the flight of the DC–6, loaded with some 12 tons of marijuana, from Colombia to Texas. The government further contends that after the pri-

---

\* Chief Judge of the Middle District of Louisiana, sitting by designation.

1. The other defendants entered pleas of guilty, had charges against them dismissed, or were not apprehended.

2. On January 16, 1981, sentences were imposed by the district court upon each of the appellants as follows: WILLIAM MICHAEL ELAM ("Mike Elam")—imprisonment for three (3) years; RICHARD VICTOR JENNINGS, JR. ("Pete" or "Dick" or "Richard" Jennings)—imprisonment for five (5) years; WILLIAM LYKERGUES MILLER, JR. ("Bill Miller")—im-

prisonment for four (4) years; GEORGE ANTHONY SEEK ("Tony Seek" or "Zeke")—imprisonment for four (4) years; parole eligibility of all appellants is to be determined by the Board of Parole according to the provisions of 18 U.S.C. § 4205(b)(2).

3. In addition to the briefs and record excerpts filed by appellants, the record on appeal consists of five (5) volumes of district court record, 1,277 pages of trial transcripts, and three separately bound transcripts of hearings on motions and sentencing proceedings.

mary landing site near Jayton, Texas, was discovered by law enforcement officers, the conspirators utilized an alternate landing site in Mexico, from whence the marijuana was shuttled (in part) to the United States.

Appellants take, of course, the opposite position, asserting that the evidence presented to the jury proved not one, but several unrelated conspiracies involving different people.

The issues on appeal include those relating to whether the evidence presented at trial was at variance with the indictment's charge of a single, large conspiracy, and instead established separate conspiracies, whether the evidence adduced at trial was sufficient to sustain the convictions of appellants Elam, Jennings and Miller, and whether the trial court properly denied motions to elect.

The election and variance issues are common to all appellants. Several sub-issues of the variance issue, including motions to sever, motions for mistrial, and several evidentiary and jury instruction issues, were raised by one or more appellants. Appellants Elam, Jennings and Miller challenge the sufficiency of the evidence against them. Appellants Miller and Seek also claim that the trial judge admitted co-conspirator statements without first determining by independent evidence that Miller and Seek and the other co-conspirators were members of the same conspiracy, contrary to the holding of *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc) *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Finally, Elam raises an issue regarding the correctness of the trial court's ruling on the admissibility of evidence of certain telephone records.

## FACTS

The various aspects of the single, overall conspiracy charged in the indictment, which appellants contend were independent conspiracies, are denominated by the defense as, "the DC–6 Venture," "the Guatemalan Venture," "the Oaxacan Transactions," and "the Jayton Incident."[4]

### THE "DC–6 VENTURE"[5]

In August, 1978, a group of persons assembled at the Timber Ridge Apartments in Dallas, to discuss preliminary plans for the purchase of approximately twelve tons of marijuana in Colombia, South America. At this meeting, plans were discussed for the transportation of the marijuana from Colombia using a Douglas DC–6 aircraft, for ultimate arrival and distribution in the United States. The apparent director of these activities was James William Edward Caldwell ("Bill Caldwell") who was a fugitive from federal authorities. Among others also present at the Timber Ridge meeting, who were destined to play key roles in the venture, were Michael Coleman Christopher ("Mike Christopher"),[6] William Anthony Dugan ("Tony Dugan"), and Jay Caldwell Emerson ("Jay Emerson" or "Jaybird"). Christopher was acquainted with qualified pilots and was asked to attend the meeting by Bill Caldwell in order to help the group procure a pilot for the contemplated mission. Appellant Elam was also present.[7]

---

**4.** Three of the appellants, Elam, Jennings and Seek, group the "Guatemalan" and "Oaxacan" ventures into one inter-related conspiracy, but appellant Miller, who was not implicated in the "Oaxacan" aspect, treats them separately. However, whether there were three or four allegedly 'extraneous' conspiracies is immaterial to the disposition of the issues presented on this appeal.

**5.** The "Jayton Incident" will be described within the context of the "DC–6 Venture," since it had at least an indirect effect on the latter.

**6.** Christopher was a key government witness who testified extensively, in return for a grant of immunity, concerning the various roles performed by different conspirators. Christopher was in attendance at most of the meetings held to conduct business in furtherance of the "DC–6 Venture," and related much information that had been told to him by various members of the conspiracy.

**7.** Although Elam was present at more than one of the early "planning stage" meetings, and was definitely in attendance at the August, 1978 Timber Ridge meeting and also at one of the two November, 1978 meetings held at the former Airport Marina Hotel at Dallas/Fort Worth Airport, during each of which a prospec-

Subsequent to the August meeting at Timber Ridge, William Edson Claire ("Bill Claire" or "Dusty Claire") purchased a DC–6 airplane bearing identification number N9393A for approximately $150,000.00. The plane was flown to Santa Maria Airport in San Jose, Costa Rica, where it remained for several months, until March, 1979, for extensive renovations and repairs costing approximately $20,000.00. The DC–6 was converted from a passenger airplane to a cargo or freight aircraft. Upon completion of the modifications and repairs, the plane was inspected by appellant Seek, Bill Claire, and others, after which it was flown to Tucson, Arizona.

Meanwhile, another meeting had been held in October of 1978 at the Brandywine Apartments in Dallas at which further negotiations and discussions were held concerning the use of the DC–6 in the smuggling venture.

In November, 1978, two meetings were held at the former Airport Marina Hotel at the Dallas/Fort Worth Airport. Bill Caldwell, Mike Christopher, Tony Dugan, David Beach, appellants Elam and Seek, four "Yankees" (the "financiers") from New York, and others were present at one or both of the meetings.[8] The primary purpose for these two meetings was the selection, by interview, of a qualified pilot to fly the DC–6 to Colombia and back. A prospective pilot was interviewed at each meeting, and additional discussions were held concerning potential loading sites and the use of a recently enlarged, secluded landing strip at Nuding Ranch near Jayton, Texas, as the planned landing site. The

cargo and fuel capacities of the DC–6 were also discussed at these meetings. Ultimately, appellant Seek was chosen to be the pilot for the DC–6, because no other qualified pilot was found who was willing to get involved in the scheme.[9]

At least one additional meeting was held that year, in December, 1978, to further discuss plans and make preparations for the "DC–6 Venture." The meeting was held at a house located at 11236 Quail Run in northeast Dallas in which Jay Emerson resided, and behind which an aluminum ramp, at least twenty feet long and four feet wide, was being built for the purpose of unloading bundles of marijuana from the aircraft. Among the persons present at this meeting were Bill Caldwell, Tony Dugan, Bill Claire, David Beach, Mike Christopher, Jay Emerson and appellant Seek. It is not clear whether appellant Elam was in attendance.

At one of these early meetings, Guatemala was specifically discussed as a possible refueling site for the Colombia-Texas flight.

During the first five months of 1979, approximately twenty meetings were held at a Hunter's Hill apartment, located on Holly Hill Road in Dallas. It was at these meetings that appellant Seek was selected as pilot, and Thomas Edward Leiferman ("Charles Lindberg") as co-pilot for the importation mission, and certain people were designated as "unloaders" of the contraband once it had arrived.[10] Appellant Jennings was present "once or twice" at the Hunter's Hill apartment during this period, at times when members of the "DC–6 Ven-

---

tive pilot was interviewed, Elam's role at each of the meetings which he attended was nevertheless described as 'negligible.' Likewise, Elam was present at his Village Trail duplex residence for several May, 1979 meetings held at that location, although he was not an active participant in the discussions which took place there. A long-standing friendship existed between Bill Caldwell and Elam, and Elam's role in the conspiracy was apparently not one of leadership.

**8.** David Beach acted as liaison between Bill Caldwell and the "Yankees."

**9.** The first prospective pilot who was interviewed at the first Airport Marina Hotel meeting refused to be interviewed a second time in a hotel room because such meetings were 'the way conspiracies were started.' The second prospective pilot interviewed at the second meeting later decided not to participate because he did not think the plans were 'together enough' and thought that 'it was going to be a bust.'

**10.** Bill Caldwell was ultimately designated as the flight engineer for the mission, and Tony Dugan was designated as crew member.

ture" were conducting business. On one occasion in January, 1979, Jennings was present when Mike Christopher paid $7,000.00 to Bill Caldwell as a payment owed for marijuana which he had earlier purchased "on credit."

In March, 1979, the DC–6, having been converted for cargo use, was flown to Tucson International Airport. On May 7, 1979, according to the accounting records of the Tucson Airport Authority, the DC–6, identification number N9393A, was fueled with 3,930 gallons of aviation fuel costing $3,584.16.

The "Jayton Incident" was the arrest of Tony Dugan and others on May 8, 1979, near the recently expanded aircraft landing strip on the Nuding Ranch near Jayton, Texas, and the seizure of approximately 950 pounds of marijuana by police at that site. That development dictated a change of landing plans for the DC–6, since the initial decision to have the DC–6 ultimately land on this strip had to be modified once the police became aware of its illegal use. The occurrence of this "Jayton Incident" destroyed the usefulness of the group's plan to employ that facility as a landing strip for the DC–6 with its cargo of contraband. Ultimately, a dry lake bed in northern Mexico was utilized as an alternate landing strip for the DC–6, which landed thereby May 26, 1979.

Prior to the arrival of the DC–6 in northern Mexico, "Mike" Natinski, an unindicted co-conspirator, rented a small plane and, with at least two other crew members, made an attempt to fly from Love Field, Dallas, to Mexico, in order to be available as "unloaders" when the DC–6 landed. However, due to bad weather conditions, they were unable to complete the flight and were forced to return to Love Field. There appellant Elam transported the grounded crew members to his residence at which one of them stayed for several days until a second, successful flight was made to transport the "unloaders" to Mexico.

On May 26th, appellant Miller and Jay Emerson, after removing the seats from a single-engine Cherokee Six airplane, identification number N166PA, and after loading the craft with open cardboard boxes of food and supplies, flew the Cherokee Six, followed at all times by a United States customs agent, from Love ,Field in Dallas, through Fort Stockton, Texas, and ultimately to the dry lake bed in northern Mexico, where it landed briefly next to the DC–6.

A white camper-truck, which had transported the boxes of supplies to the Cherokee Six prior to take-off in Dallas, was used to store the seats which had been removed from the craft. The truck was taken first to the residence of Bill Caldwell, and ultimately to the residence of appellant Elam.

After rendezvousing with the DC–6, the Cherokee Six and the DC–6 both took off on parallel courses and flew a short distance, both landing again on another dry lake bed, approximately 50 miles southeast of the rendezvous site. After a short time, the Cherokee Six took off again towards the United States, carrying at least five passengers on the return flight.

On May 27th, one of several meetings was held at Summer Hill apartments in Dallas to discuss the need for a "shuttle service" to transport the Colombian marijuana from northern Mexico to the United States. Present at this meeting were appellant Seek,[11] Bill Caldwell, Tony Dugan, Mike Christopher, Bill Claire and "Mike" Natinski. Mike Christopher was given $2,500.00 at this meeting with which to procure a shuttle aircraft and he used these funds, as well as a later additional advancement of $5,000.00, as a down payment on the "lease-purchase" of a small plane, an Arrow Commander ("Grand Commander"). Because appellant Seek would not firmly

---

11. It is reasonable to conclude that appellant Seek, who piloted the DC–6 when it landed in Mexico on or before May 26th, was brought back by the Cherokee Six; records of the Mar-

riott Hotel in Dallas show that he checked in as a guest of that establishment on the night of May 27th, 1979.

agree to pilot the Grand Commander,[12] Mike Natinski was offered the job of piloting the shuttle, despite the group's reservations concerning his qualifications. Their reservations were well founded: Natinski seriously damaged the aircraft by overboosting its engines while on a practice flight and the Grand Commander was never actually utilized as a shuttle aircraft for the venture. However, at least one other aircraft, a twin-engine Navajo, was used to perform shuttle services between northern Mexico and the United States.

During the few days following the landing of the DC–6 in northern Mexico, several meetings were also held at the duplex residence of appellant Elam, located at 7731 Village Trail, Dallas, to discuss the status of shuttle plans for the transportation of the imported marijuana. At these meetings, discussions were still being had concerning the feasibility of repairing and using the Grand Commander as a shuttle.

A few days after the DC–6 had initially landed in northern Mexico, on approximately May 27th or 28th, the Mexican police discovered the abandoned plane, identification number N9393A, (which had by that time been unloaded) near the city of Ocampo, State of Coahuila, Mexico, on a dry lake bed known as "Milk Lake." Approximately five kilos of Colombian marijuana debris, mostly seed, were found inside the plane, which was otherwise mostly empty and out of fuel. No auxiliary fuel tanks had been mounted on the aircraft. Sixteen days after the discovery of the plane, the Mexican authorities located a twelve ton cache of

Colombian marijuana on a farm called Rancho El Guaje, located near another dry lake bed called "King's Chemist," a short distance north of the site where the DC–6 was found.[13]

Between the time the DC–6 was discovered and the time the contraband was found, four collect, long distance telephone calls were placed from Torreon, Mexico, to appellant Elam's residence on Village Trail.[14] Torreon is located in the region of Coahuila, Mexico, and is the closest large city near to the landing site of the DC–6. One of the unindicted co-conspirator "unloaders" testified that certain English-speaking members of the "unloading" team had stated that they were going to Torreon to call Dallas.

One hundred pounds of the Colombian marijuana which had been successfully shuttled to the United States was delivered to Mike Christopher. In July, he made a partial payment of $15,000.00 on the purchase price of the substance to Bill Caldwell in the presence of appellant Jennings. Witnessing the transaction, appellant Jennings held up to the light one of the hundred dollar bills used by Christopher in payment and jokingly remarked, "D.E.A." [Drug Enforcement Agency].

### THE "GUATEMALAN VENTURE"

Appellants Jennings and Miller contend that, independent of the "DC–6 Venture" described above, they and Carlos Teodoro Trevino-Sanchez ("Trevino"), with the cooperation of Alfredo Campos Verastegui ("Alfredo")[15] and Juan Gustavo Campos ("Gus-

---

**12.** Seek did agree, however, to fly the Grand Commander from Love Field, where Christopher had had it delivered after its purchase in Florida, to Arlington Airport, which was closer to Christopher's residence.

**13.** Also found at the site were numerous open cardboard boxes containing supplies and food. Although the DC–6, the contraband and the supply boxes were not discovered at exactly the same location, one of the unindicted co-conspirator "unloaders" testified that, after the task of unloading the plane was completed, the plane was 'moved to another location.'

**14.** Telephone records for service installed at 7731 Village Trail, held in the name of "John

Robinson," indicate that the four collect calls were accepted from Torreon in June, 1979: One on June 1st, two on June 8th, and one on June 9th. "Kevin Robinson" was an alias used by appellant Elam, and this alias appeared on a New Mexico driver's license used by Elam to identify himself to a Special Agent of the Drug Enforcement Agency on November 1, 1979.

**15.** Alfredo Campos was an attorney residing and practicing criminal defense law in Mexico City, and was working as an informant in cooperation with the United States Drug Enforcement Agency (D. E. A.). Because he spoke limited English, Alfredo utilized Errol Chavez ("Jerry Sanchez"), an undercover D. E. A. agent, as a personal interpreter.

tavo") and others, had been planning a separate venture in the fall of 1978, which was smaller in scale than the "DC–6 Venture," the purpose of which was to import Colombian marijuana using an unspecified 'large' airplane. The plan to import Colombian marijuana had originated when an earlier plan to import marijuana from a contact of Gustavo Campos in Vera Cruz, which had been formed in the summer of 1978, had not materialized.

Appellant Jennings had told Trevino that he knew "there were two Yankees here in Dallas [that] had a DC–6 that they [sic] were planning on doing a trip to Colombia with marijuana," and, in fact, Trevino had encouraged appellant Jennings to attempt to contact the "DC–6 venturers" in order to rent the DC–6 from them or become involved in that venture; however, Jennings reported back to Trevino that the Yankee group "would have nothing to do with them [Trevino and Jennings]."

Foremost in priority in Trevino's and Jennings' plan to execute their Colombian conspiracy was the procurement of a secluded aircraft landing strip midway between Colombia and the United States [16] which met specifications provided by appellant Jennings and which would be suitable for use as a re-fueling location for the "large" aircraft of the type contemplated for use in the Colombian mission. Thus, approximately two to three weeks after the failure of the Vera Cruz plan, the search for a suitable airstrip was initiated.

Gustavo Campos, who was an acquaintance of Trevino, located a person, Alfredo Campos, who claimed to have contacts in Central America who had access to suitable airstrips. In early December, 1978, after receiving permission from appellant Jennings, by telephone, to go on an inspection tour of the available airstrips, Trevino and Gustavo travelled to Mexico City to meet with Alfredo, who informed them that his contacts were in Guatemala City, Guatemala. Trevino, Gustavo and Alfredo then travelled to Guatemala City, where Alfredo's contacts gave them a tour of approximately six proposed refueling sites, one of which was deemed to be satisfactory by Trevino. Trevino notified appellant Jennings that a suitable airstrip had been located 'near Flores' at a site utilized by oil companies to land DC–6's and DC–7's.

Appellant Jennings was apparently unwilling to rely upon Trevino's judgment because when Trevino asked Jennings for expense money to cover the costs of the inspection tour and the monies owed to Alfredo, Trevino was told by Jennings that someone (appellant Miller) would be sent who would bring $2,000.00 in expense money and who would inspect the airstrip in order to make certain that it was sufficient. Upon arriving in Guatemala, and despite Trevino's threats to murder him, appellant Miller refused to turn over the expense money to Trevino, stating that he [Miller] must first personally inspect the airstrip for suitability.[17] Upon inspection, Miller determined that the airstrip was "perfect" and communicated this fact to appellant Jennings in a private telephone conversation to which Trevino was not privy.

Trevino was to get paid for his aid in securing the Guatemalan contacts, the refueling site and refueling provisions; however, at a meeting between Trevino and Jennings in Dallas, in late December, 1978, Jennings told Trevino that lack of finances prevented him from doing the Colombian trip for at least two to six months. In

16. Although the evidence showed that the Guatemalan venturers were still looking through catalogs of airplanes during this period, in an attempt to choose an appropriate aircraft for their venture, detailed specifications for a clandestine airstrip were given to Trevino by Jennings: the length of the runway had to be between 6,000 and 7,000 feet, and the airstrip must be capable of supporting a large, unspecified aircraft weighing a minimum of ten tons.

17. Although Miller did ultimately convey the expense money directly to Alfredo prior to his personal inspection of the airstrip, Miller never gave expense money to Trevino, nor permitted Trevino to reimburse Alfredo directly. Trevino testified that he had not wanted anyone, including Miller, "to have anything to do with what we were doing," and had expected Miller to be nothing more than a mere courier for Jennings.

order to improve their financial positions and to become financially able to make the Colombian trip, Trevino and Jennings then planned to execute a number of "Oaxacan Transactions."

During the first few days of January, 1979, Alfredo contacted appellant Miller by telephone, through his interpreter, "Jerry Sanchez," demanding that a meeting be held in Dallas between Miller, Jennings, and Alfredo to discuss the compensation which was due to Alfredo for his role in locating the Guatemalan refueling site. Miller indicated that Jennings would have to "check with other people before a decision could be made" with regard to a Dallas meeting, since such a meeting was not really deemed necessary and would "cost more than the . . . money we're talking about." Nevertheless, upon Alfredo's insistence, a Dallas meeting was finally arranged and held at a Howard Johnson's hotel in Dallas on January 10th, at which appellants Jennings and Miller, as well as Alfredo and his "interpreter," were present. During the meeting, the participants discussed the utilization of the Guatemalan landing strip; Jennings informed Alfredo that a smuggling operation would commence between two, three to six months, placing it in May or June of 1979, and stated that the operation would utilize a large aircraft which would go through Guatemala, be refueled, and continue up to the United States. Alfredo was promised that he would be paid fifty percent of his compensation in advance and fifty percent after the refueling mission was accomplished. The contemplated "Oaxacan Transactions" were also discussed, as well as the deteriorating relationship between Trevino and Alfredo and Miller. After approximately one hour, the meeting adjourned.

## THE "OAXACAN TRANSACTIONS"

In early January, 1979, appellant Jennings contracted with a person known as "B.C.,"[18] a supplier of marijuana from the Oaxacan region of southern Mexico, to purchase approximately 1800 pounds of Oaxacan marijuana. Trevino was to transport the load from Oaxaca to the Falcon Lake, a reservoir on the Mexican-United States border. Trevino was paid approximately $10,000.00, in addition to reimbursements for his costs and expenses, for his aid in the transaction. The estimated profits which were expected to accrue to appellant Jennings as a result of this single transaction were approximately $100,000.00. Trevino successfully hauled and delivered the contraband to Falcon Lake, but a boat which was used to transport the cargo across the lake sank and part of the load was lost as a result.

An attempt at a second Oaxacan transaction proved totally unsuccessful. Trevino had contacted Alfredo to secure a suitable truck with which to haul another load of marijuana, but when they arrived in Oaxaca, the source of their contraband refused to deal with Trevino and Alfredo because of allegations that Trevino had previously taken D. E. A. agents to Oaxaca.[19] Trevino was unable to convince either the suppliers or Jennings that he had not taken any D. E. A. agents to Oaxaca. In March of 1979, Trevino arranged a meeting at the LeBaron Hotel in Dallas,[20] at which he and Jennings and "B.C.," as well as Alfredo and his interpreter, were present, in order to establish his innocence, but all efforts to exonerate himself failed and neither Trevino nor Alfredo had any further contact with appellant Jennings thereafter.

---

18. It was shown at trial that "B.C." was *not* the same person as "Bill Caldwell."

19. As noted above, Alfredo was, in fact, acting in cooperation with the D. E. A., utilizing a D. E. A. special agent as his "interpreter." The D. E. A. had made plans to arrest the drug traffickers at Falcon Lake upon their return to the Mexican-American border.

20. Present at the meeting on March 22, 1979, at the LeBaron Hotel were appellant Jennings,

Alfredo and his "interpreter," and Trevino. Almost immediately, Jennings advised the group that they were moving the meeting to appellant Miller's house, since he was unwilling to have any conversations regarding narcotics transactions in the hotel room. At the short meeting, which lasted less than an hour, Jennings expressed his concern over the fact that there had never been any problem with Oaxacan transactions until Trevino and Alfredo became involved.

## ISSUES ON APPEAL

### I. VARIANCE

Each appellant, except Jennings,[21] contends that his conviction should be reversed on the alleged grounds that a fatal variance exists between the indictment, which charged a single, multi-faceted conspiracy,[22] and the proof at trial, which appellants argue demonstrated the existence of several independent conspiracies.

■ Whether a single conspiracy or multiple conspiracies existed is a question of fact for the jury to determine. *United States v. Michel*, 588 F.2d 986 (5th Cir. 1979); *United States v. Rodriguez*, 509 F.2d 1342 (5th Cir. 1975).

■ The existence of the alleged conspiracy may be proved through the introduction of direct or circumstantial evidence of an agreement or common purpose to violate the law. *United States v. Rodriguez, supra; United States v. Warner*, 441 F.2d 821 (5th Cir. 1971), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971); *United States v. Morado*, 454 F.2d 167 (5th Cir. 1972). If the totality of the evidence is adequate to demonstrate that all of the alleged co-conspirators directed their efforts towards the accomplishment of a single goal or common purpose, then the existence of a single conspiracy may be found. *United States v. Perez*, 489 F.2d 51 (5th Cir. 1973). It is well settled in this circuit that findings made by a jury will not be reversed unless, upon review of the evidence, viewed in the light most favorable to the Government, reasonable jurors could not find the evidence inconsistent with every hypothesis of the accuseds' innocence. *United States v. Michel, supra*, citing *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Leach*, 613 F.2d 1295 (5th Cir. 1980); *United States v. Baldarrama*, 566 F.2d 560 (5th Cir. 1978); *United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976).

■ The government must prove beyond a reasonable doubt, either by direct or circumstantial evidence, a common agreement to violate the law, and must establish beyond a reasonable doubt that a common conspiracy existed between knowing participants. *United States v. Michel, supra*, citing *United States v. Warner*, 441 F.2d 821 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971); *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). In other words, it is essential to the government's case that there be proof beyond a reasonable doubt (a) that a common agreement or conspiracy existed, (b) that the accused knew of the conspiracy, and (c) that the accused, with knowledge, voluntarily joined the conspiracy. *United States v. Littrell*, 574 F.2d 828, 832 (5th Cir. 1978) and cases cited therein.

**21.** Appellants Elam, Miller and Seek address the variance issue directly in their appellate briefs. Appellant Jennings does not address the variance issue directly, but contends that the evidence adduced at trial is insufficient to convict him because, although there is evidence linking him with the "Guatemalan" and "Oaxacan" ventures, there is no evidence linking him to the "DC–6" venture. Since the predicate for Jennings' insufficiency argument is a finding that these three ventures were separate and distinct conspiracies, rather than one large, multi-faceted conspiracy, the court's resolution on the variance issue will influence resolution of the insufficiency issue raised by Jennings.

**22.** Although Elam and Jennings assert in their joint brief that the indictment alleges *two* conspiracies (one to possess with intent to distribute and to distribute marijuana in violation of 21 U.S.C. § 846 and another to import or distribute marijuana intending that it be unlawfully imported in violation of 21 U.S.C. § 963), it is apparent that the indictment actually charges one conspiracy to violate three statutes (21 U.S.C. § 841(a)(1), 21 U.S.C. § 952(a) and 21 U.S.C. § 959), which conspiracy violates two statutes (21 U.S.C. § 846 and 21 U.S.C. § 963). The indictment reads in pertinent part:

From on or about August 1, 1978 to on or about July 1, 1979, * * * defendants, knowingly and intentionally did combine, conspire, confederate and agree together and with each other and with other persons whose names are to the Grand Jury known and unknown to commit offenses against the United States, that is, violations of Title 21, United States Code, Sections 952(a), 959 and 841(a)(1).

\* \* \* \* \* \*

All in violation of Title 21, United States Code, Sections 963 and 846.

■ There are various factors typically considered in making a determination as to whether a given criminal endeavor comprises one, or more than one, conspiracy. One such factor is the existence among the defendants of a common goal. *United States v. Tilton*, 610 F.2d 302 (5th Cir. 1980). If the totality of evidence is sufficient to demonstrate a concert of action unified by a common purpose, then a single conspiracy may be found. *United States v. Perez*, 489 F.2d 51 (5th Cir. 1973).

Another factor is the inherent nature of the criminal scheme.[23]

■ Where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture, where there are several parts inherent in a larger common plan, or where the character of the property involved or the nature of the activity is such that knowledge on the part of one member concerning the existence and function of other members of the same scheme is necessarily implied due to the overlapping nature of the various roles of the participants, the existence of a single conspiracy will be inferred. *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. Tilton*, 610 F.2d 302 (5th Cir. 1980); *United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976); *United States v. Baldarrama*, 566 F.2d 560 (5th Cir. 1978).[24]

■ Finding that they impede rather than facilitate analysis of the "single conspiracy—multiple conspiracy" issue, we eschew utilization of figurative analogies such as "wheels," "rims" and "hubs," which are often used to describe the nature of complex conspiracies. We reiterate Judge Brown's comment in *United States v. Perez*, 489 F.2d 51 (5th Cir. 1973), that "[c]onspiracies are as complex as the versatility of human nature and federal protection against them is not to be measured by spokes, hubs, wheels, rims, chains or any one or all of today's galaxy of mechanical molecular or atomic forms." 489 F.2d at 59, n.11. The government is not required to attempt to squeeze conspiracy into any particular mold. If the evidence establishes a common agreement, knowledge of the agreement by the defendant, and that the defendant voluntarily joined the unlawful scheme, conspiracy is proved without regard to its shape or other configurations. *United States v. Littrell*, 574 F.2d 828 (5th Cir. 1978).

■ Still another factor is the interrelationships between the various parts and parties of the scheme. Where the memberships of two criminal endeavors overlap, a single conspiracy may be found. *United States v. Tilton*, 610 F.2d 302 (5th Cir. 1980). Where members of one enterprise have knowledge, actual or implied, of the existence of members of a related enterprise, and where it is shown that a single "key man" was involved in and directed illegal activities, while various combinations of other defendants exerted individual efforts toward a common goal, a finding of the existence of a single conspiracy is warranted. *United States v. Morado*, 454 F.2d 167 (5th Cir. 1972). We do not imply that the various members of a conspiracy which functions through a division of labor must have an awareness of the existence of the other members, or be privy to the details of each aspect of the conspiracy. *United States v. Brasseaux*, 509 F.2d 157 (5th Cir. 1975). And, for the purpose of determining whether a single conspiracy exists, a common plan does not become several plans simply because some members are cast in more vital roles than others or because certain members perform only a single, minor

---

**23.** See generally, Note, Federal Treatment of Multiple Conspiracies, 57 Colum.L.Rev. 387 (1957), which discusses the distinction between the various types of multi-faceted conspiracies which have been found to constitute a single conspiracy, e.g., "wheel" conspiracies, "chain" conspiracies, and others.

**24.** For additional helpful commentary on the frustrating and challenging task of distinguishing between evidence which demonstrates the existence of a single conspiracy from evidence which implies multiple conspiracies, see *Developments in the Law—Criminal Conspiracy*, 72 Harv.L.Rev. 920, 922–935, 991–993 (1959).

function; likewise, a common plan is not transformed into several plans on account of internal personnel changes. *United States v. Michel*, 588 F.2d 986 (5th Cir. 1979).

■ Viewing the evidence in the light most favorable to the government, *United States v. Michel, supra*, we conclude that a reasonable jury could have found that appellants were engaged in one common criminal enterprise, rather than independent activities.

Although Jennings and Miller assert that their efforts to secure a Guatemalan landing strip related to their abortive scheme with Trevino to import Colombian marijuana for themselves, the jury could reasonably have concluded that their activities were in furtherance of the DC–6 venture headed by Bill Caldwell. The evidence shows a close relationship between Jennings and Caldwell and establishes that Jennings had knowledge of this plan, including the necessity for an intermediate landing and refueling site. The fact that Jennings sent Miller to inspect the airstrip and that he paid for its use at a time when Jennings and Trevino had not even selected an airplane supports the conclusion that the Guatemalan strip was for the DC–6. Moreover, the fact that Jennings and Trevino never did acquire an airplane and took no additional steps toward furtherance of this claimed separate conspiracy supports the conclusion that these actions were in furtherance of the plan to smuggle a DC–6 aircraft loaded with marijuana into Texas.

As for the "Oaxacan Venture," Jennings himself was quoted as stating that the proceeds would be applied toward the Colombian trip. The evidence shows that Oaxacan Mexican marijuana was made available to Bill Caldwell, leader of the DC–6 scheme, and that Jennings was present when Caldwell received payment for some of it. The evidence supports the government's contention that these attempts to import and distribute Mexican marijuana were undertaken in an effort to cover the high cost of acquiring and modifying the DC–6 and other aircraft and the other substantial expenses of the Colombian scheme.

■ Despite the fact that many of the co-conspirators each performed discrete tasks, and may even have been totally unaware of the precise roles played by other members of the criminal enterprise, the jury could have reasonably found that there was a single conspiracy in existence, i.e., the "DC–6 Venture," the goal of which was to purchase and import approximately twelve tons of marijuana from Colombia for ultimate arrival and distribution in the United States, and that the "Guatemalan Venture," the "Oaxacan Transactions," and the "Jayton Incident" were merely related aspects of the single common goal. The fact that a division of labor existed among the co-conspirators is not inconsistent with a finding that a single conspiracy existed. *United States v. Becker*, 569 F.2d 951 (5th Cir. 1978); *United States v. Michel*, 588 F.2d 986 (5th Cir. 1979); *United States v. Scott*, 555 F.2d 522 (5th Cir. 1977).

■ It is not necessary that all the members of a conspiracy know each other or that they work together on every transaction. *United States v. DeLeon*, 641 F.2d 330 (5th Cir. 1981). Indeed, in a complex undertaking such as this, separate functions are dictated by the nature of the enterprise. There must be financiers, flight crews, ground crews, loaders and unloaders, mechanics, motor vehicle drivers, message carriers, providers of meeting places and others in order to further a conspiracy of such magnitude.

There is ample evidence showing interrelationships among these defendants and others, joint activities and similar methods of operation to support the jury's finding of a single conspiracy. *United States v. Ochoa*, 609 F.2d 198 (5th Cir. 1980).

## II. SUFFICIENCY OF THE EVIDENCE

■ Appellants Elam, Jennings and Miller raise the issue of the sufficiency of the evidence to support their convictions. Initially we note that as to appellants Jennings and Miller, this issue was not properly preserved. Following the close of the

government's case, all three appellants moved for acquittal under Rule 29(a), Fed. R.Crim.P.[25] Upon denial of the motions, appellant Elam rested without presenting any evidence but Jennings and Miller both offered evidence and failed to renew their motions for acquittal after the close of all of the evidence. The failure to reurge the motion for acquittal, after introduction of defense evidence, constitutes a waiver of objection to the denial of the motions. Rule 29(a), Fed.R.Crim.P.; *United States v. Juarez*, 566 F.2d 511 (5th Cir. 1978); *Meeks v. United States*, 259 F.2d 328 (5th Cir. 1958); *Jackson v. United States*, 250 F.2d 897 (5th Cir. 1958). Consequently, the evidence as to Jennings and Miller cannot be reviewed except to prevent "manifest miscarriage of justice" or unless we find "plain error." *United States v. Perez*, 651 F.2d 268 (5th Cir. 1981); *United States v. Owens*, 453 F.2d 355 (5th Cir. 1971).

The argument made by Jennings and Miller is again predicated upon their position that the evidence proved not one but several different, unrelated conspiracies. Both admit their involvement in the "Guatemalan Venture" and Jennings in the "Oaxacan Transactions." Miller admits that he ferried supplies into northern Mexico for the DC–6 crew and ferried out the flight crew. Miller argues that these services were performed simply to help out fellow Americans and that he was not involved in the DC–6 venture.

This argument that the evidence proved several different conspiracies was not accepted by the jury and is not accepted by us. There is ample evidence, by any standard, to sustain the convictions of both Jennings and Miller of participation in a single conspiracy, as alleged in the indictment.

■■■■■■ As to appellant Elam, who properly preserved this issue, we must view all the evidence, both direct and circumstantial, and all credibility choices, in the light most favorable to the prosecution. *Glasser*

*v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Leslie*, 542 F.2d 285 (5th Cir. 1976); *United States v. Rojas*, 537 F.2d 216 (5th Cir. 1976); *United States v. Scott*, 555 F.2d 522 (5th Cir. 1977).

The test for sufficiency of the evidence is whether reasonable jurors could find the evidence inconsistent with every hypothesis of innocence. *United States v. Scott, supra; United States v. Leach*, 613 F.2d 1295 (5th Cir. 1980); *United States v. Barrentine*, 591 F.2d 1069 (5th Cir. 1979).

Conceding that the standard for review enunciated above is correct, Elam contends that he was convicted simply because of his acknowledged friendship with Bill Caldwell, the ringleader. He argues that these are merely suspicious circumstances which may not substitute for proof of his guilt, *United States v. Dyar*, 574 F.2d 1385 (5th Cir. 1978), and that he was a mere "hanger-on" who might have had some knowledge of the activities of the other defendants but who never joined their conspiracy.

■■■■ The evidence shows that Elam was present at several meetings at which the plan to import large quantities of marijuana from Colombia to the United States was discussed in his presence. Some of the meetings were held at Elam's home, where shuttling of the marijuana was discussed. When the ground crew could not get to the landing site of the DC–6 in northern Mexico because of bad weather, Elam picked them up at Love Field in Dallas and brought them to his residence where they stayed until the weather cleared. When Miller flew the Cherokee airplane with supplies, the seats were removed and boxes of food were loaded aboard. The pick-up truck which delivered the food and carried the seats away was driven first to Caldwell's house and then to Elam's house where it stayed. Between June 1st and June 9th, collect telephone calls from Torreon, Mexico were made to Elam's telephone. These col-

**25.** Fed.R.Crim.P. 29(a) provides: "Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place.... If a defendant's motion for judgment of acquittal at the close of the evidence offered by the government is not granted, the defendant may offer evidence without having reserved the right."

lect calls were accepted. Torreon was the closest city to the dry lake bed where the marijuana was stacked and David Ischy, a ground crew member, testified that others would go to Torreon to make phone calls to their confederates in the United States. The evidence shows that Elam was fully aware of the plan, that his home was used as a meeting place and a sanctuary for the conspirators, that his telephone was used to contact the group in Mexico and that he actively assisted by providing transportation for other members of the conspiracy, all in furtherance of the objectives of the conspiracy.

Our review of the evidence convinces us that reasonable jurors could find the evidence inconsistent with every hypothesis of innocence and that Elam was properly convicted.

## III. THE JAMES ISSUES

Appellants Seek and Miller, still maintaining that the evidence showed multiple conspiracies, rather than a single conspiracy, contend that the trial judge committed error in permitting the jury to consider "hearsay" statements of coconspirators under Federal Rule of Evidence 801(d)(2)(E) and in failing to instruct the jury regarding consideration of those statements.

At the close of the government's case, upon motion by the prosecution, the trial judge made the following finding:

"I do find that there was a preponderance of the evidence to establish the existence of a conspiracy and the membership in the conspiracy is existing of those named in the indictment plus others ... that the statements were made in the furtherance of the conspiracy and for the purposes of the conspiracy and that there was substantial independant evidence at the time those statements were offered

and now the Court finds at the conclusion of the Government's case that there is a preponderance of the evidence to make those findings."

Seek and Miller attempted to secure a ruling as to whether the evidence proved one, or more than one, conspiracy, which the trial court declined to do.

██ The finding quoted above is in full accord with the holding of *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); see also *United States v. Grassi*, 616 F.2d 1295 (5th Cir. 1980); *United States v. Atkins*, 618 F.2d 366 (5th Cir. 1980), *rehearing denied*, 629 F.2d 1350 (5th Cir. 1980); *United States v. Mesa*, 660 F.2d 1070 (5th Cir. 1981); *United States v. Hawkins*, 661 F.2d 436 (5th Cir. 1981), and the evidence fully supports that finding as to each defendant.

These appellants also requested a modified "Apollo"[26] charge to the jury.

██ This court's decision in *James* makes it plain that only when the trial judge has determined, at the close of the evidence, that the prosecution has not demonstrated the defendant's participation in a conspiracy by a preponderance of independent evidence, that an instruction to the jury should be considered. 590 F.2d at 582–83. Under those circumstances the trial judge must decide whether a cautionary instruction to the jury will cure the prejudicial effect of the co-conspirator's statements, or whether a mistrial is required. *United States v. Grassi*, 616 F.2d 1295 (5th Cir. 1980). Here the trial judge correctly determined that the prosecution had demonstrated by a preponderance of evidence independent of the co-conspirator statements that a conspiracy existed and that each defendant participated in the conspir-

**26.** *United States v. Apollo*, 476 F.2d 156 (5th Cir. 1973), was overruled by the en banc court in *United States v. James*, 590 F.2d 575 (5th Cir. 1979), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed. 283 (1979). The requested jury instruction was:

I have instructed you as to the consideration of the acts and declarations of one alleged

conspirator as evidence against another alleged conspirator. You will not consider any such acts or declaration [sic] against any defendant unless you find beyond reasonable doubt that the person doing the act [sic] making the declaration was a member of the same conspiracy as was that defendant.

acy. Accordingly, there was no occasion for the requested jury instruction and it was properly refused.

Appellant Seek urges another alleged error in connection with the admission of co-conspirator statements. Seek contends that he was prejudiced as a result of the trial court's alleged error in failing to give a contemporaneous limiting jury instruction upon the admission of evidence of allegedly "extraneous" acts relating to the "Oaxacan Transactions." The requested charge would have restricted the admissibility of such evidence solely to co-defendant Jennings, who had been directly involved in those transactions.

This contention has no merit. The giving of such an instruction would necessarily have been predicated upon the trial judge's determination that the evidence proved multiple conspiracies, not one. This is a question of fact for the jury to determine and the trial judge properly refused to give the requested instruction. *United States v. Michel*, 588 F.2d 986 (5th Cir. 1979); *United States v. Rodriguez*, 509 F.2d 1342 (5th Cir. 1975).

## IV. MOTIONS FOR SEVERANCE AND MISTRIAL

■ Several appellants argue that the trial judge erred in failing to grant motions for severance and mistrial during and after the trial. These motions, too, are predicated upon the assertion that the evidence established several separate conspiracies. Our conclusion that the evidence supports the jury's finding of a single conspiracy disposes of these issues. It is well settled that a charge of conspiracy initially legitimizes joinder of all defendants, Rule 8, Fed. R.Crim.P.; *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), and appellants have not demonstrated such compelling prejudice that they were unable to obtain a fair trial. *United States v. DeSimone*, 660 F.2d 532 (5th Cir. 1981).

**27.** "Duplicity" is the joining, in a single count of an indictment, of two or more separate offenses. *United States v. Chrane*, 529 F.2d 1236

## V. DUPLICITY IN THE INDICTMENT

All four appellants raise, as a common ground of error, the failure of the trial court to require the government to elect to proceed on only one of the offenses contained in the allegedly duplicitous indictment.[27] They argue that an election should have been required as a corrective measure to remedy the adverse effect upon the defendants.

As noted earlier, this one count indictment alleges a single conspiracy in violation of 21 U.S.C. § 846 (Subchapter I of the Comprehensive Drug Abuse Prevention & Control Act of 1970) and 21 U.S.C. § 963 (Subchapter II of the Act). The indictment charges that the defendants conspired to violate 21 U.S.C. § 841(a)(1) (distribution or possession of contraband with intent to distribute), 21 U.S.C. § 952(a) (importation of contraband into the United States) and 21 U.S.C. § 959 (distribution of imported contraband). Thus, the defendants are accused of one conspiracy to violate three statutes, which conspiracy violates two statutes.

■ It is well established that a single conspiracy may have several objectives and when a conspiracy to violate two or more statutes is alleged, the jury may return a verdict of guilty if they find beyond a reasonable doubt that a conspiracy to violate any one of the statutes existed. *Braverman v. United States*, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942); *United States v. Wilkinson*, 601 F.2d 791 (5th Cir. 1979); *Overstreet v. United States*, 321 F.2d 459 (5th Cir. 1963).

As we view the argument made by appellants, they make no complaint regarding the allegations that the criminal agreement was to violate three different statutes, nor, under the jurisprudence cited, could they. Their motion to elect was directed toward requiring the government to elect whether it would prosecute them for conspiracy under 21 U.S.C. § 963 or for conspiracy under 21 U.S.C. § 846. The trial judge rejected the motion and denied motions for new trial predicated upon the same argument.

(5th Cir. 1976), citing Wright, Federal Practice & Procedure, § 142, p. 306 (1969 ed.)

■ This court has held, *United States v. Rodriguez*, 585 F.2d 1234 (5th Cir. 1978), *rehearing en banc*, 612 F.2d 906 (5th Cir. 1980), *aff'd sub nom.*; *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), that Congress intended to permit the imposition of consecutive sentences for violations of § 963 and § 846 even though such violations arise from a single conspiracy having multiple objectives. Thus, it appears that these defendants could have been charged with separate offenses under § 963 and under § 846 despite there being only one conspiracy and, upon conviction, they could have been sentenced consecutively.

■ Their argument that the indictment is duplicitous because it charges two offenses in one count is interesting, but the issue was not timely raised. Rule 12(b)(2), Fed.R.Crim.P.,[28] provides that defenses and objections based upon defects in the indictment such as duplicity are waived unless asserted prior to trial. Although the claimed defect in this indictment is apparent upon its face, the objection was not made until the close of the government's case. It therefore comes too late.

This court has consistently required that objections to the indictment, such as duplicity, must be raised prior to trial. *United States v. Busard*, 524 F.2d 72 (5th Cir. 1975); *United States v. Williams*, 203 F.2d 572 (5th Cir. 1953), *cert. denied*, 346 U.S. 822, 74 S.Ct. 37, 98 L.Ed. 347 (1953). See also *Durland v. United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896) upon which Rule 12(b) is predicated.

■ Like the trial judge, we find no cause for granting relief from waiver under the provisions of Rule 12(f). No actual prejudice has been demonstrated to any defendant because of the alleged duplicity of the indictment. As the trial judge correctly noted, had the court granted the motion to elect at the close of the government's case, no evidence would have been excluded from the jury. Moreover, because the indictment contained but a single count, no defendant was in jeopardy of receiving consecutive sentences. The trial judge properly exercised his discretion in denying relief from waiver. *Brooks v. United States*, 416 F.2d 1044 (5th Cir. 1969), *cert. denied sub nom. Nipp v. United States*, 400 U.S. 840, 91 S.Ct. 81, 27 L.Ed.2d 75 (1970); see also *United States v. Williams*, 544 F.2d 1215 (4th Cir. 1976).

## VI. SUFFICIENCY OF JURY INSTRUCTIONS

All four appellants[29] raise, in one manner or another, the sufficiency of the trial judge's instructions to the jury on the law of conspiracy. Appellants argue that under the charge given, the jury could have returned a less than unanimous verdict, in that some jurors might have been convinced that a particular defendant had conspired to import marijuana while others might have been convinced that he conspired to possess it with intent to distribute, or that the jury might have found different defendants guilty of conspiring to violate different statutes.

■ The trial judge specifically instructed the jury that in order to convict each defendant the evidence as to him must be considered separately and individually, that the jury must come to a unanimous

---

**28.** Rule 12(b) provides, in part:

Any defense, objection, or request which is capable of the termination without trial of the general issue may be raised before trial by motion. . . . The following must be raised prior to trial: * * * *

\* \* \* \* \* \* \*

(2) Defenses and objections based on defects in the indictment or information (other than it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings); * *

(f) Failure by a party to raise defenses or objections or to make requests which must be made prior to trial . . . shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

**29.** Appellant Seek failed to timely object to the court's instructions on conspiracy as required by Rule 30, Fed.R.Crim.P. Consequently, our review as to Seek is limited to "plain error." *United States v. DeLeon*, 641 F.2d 330 (5th Cir. 1981); *United States v. Bates*, 600 F.2d 505 (5th Cir. 1979).

determination that the conspiracy proved was the same conspiracy charged in the indictment, and that the defendant under consideration was in fact a member of that conspiracy and not another.[30] Considering the instructions as a whole, they adequately explained the law of conspiracy and the nature of the finding which the jury was required to make as to each defendant. The jury was not misled or confused and the instruction given by the court was sufficient. *United States v. DeLeon,* 641 F.2d 330 (5th Cir. 1981); *United States v. Rodgers,* 624 F.2d 1303 (5th Cir. 1980); *United States v. LeCompte,* 599 F.2d 81 (5th Cir. 1979). Moreover, since this indictment alleges a single conspiracy and we have found that the evidence is sufficient to support the jury's conclusion, the guilty verdict will be interpreted as if the jury did follow the instructions of the trial judge as given. *St. Clair v. United States,* 154 U.S. 134, 14 S.Ct. 1002, 38 L.Ed. 936 (1894).

## VII. EVIDENCE OF TELEPHONE RECORDS

Finally, appellant Elam argues that the trial judge committed prejudicial error in permitting the government to introduce certain records of long distance telephone calls placed between Elam's residence at 7731 Village Trail in Dallas and Torreon, Mexico, and the testimony of a witness linking him to that telephone.

The telephone in question was listed under the name of "John Robinson" and a special agent for the drug enforcement agency in Austin, Texas, testified that Elam had used the name "Kevin Robinson" on November 1, 1979. Elam also objected to the admission into evidence of the agent's testimony.

Elam alleges prejudice because, although the government's pretrial exhibit list specified numerous telephone records, appellant's counsel was not notified of the specific toll records which were ultimately offered into evidence and the drug enforcement agent was not listed on the pretrial witness list furnished by the government. It is stipulated that local rules of court require that "both parties exchange witness lists and exhibit lists and copies of documents."

The narrow issue presented for review is whether the government substantially com-

---

**30.** The trial judge gave the following jury instruction regarding the unanimity requirement of their verdict as it related to conspiracy:

"As I have previously instructed you, these defendants are charged with conspiring to violate three separate criminal statutes. If each of you finds beyond a reasonable doubt that a defendant has conspired to violate one of those three criminal statutes, but you are all unable to unanimously specify one single statute which all of you agree that that defendant has conspired to violate, then you cannot return a verdict of guilty.

For example, if six of you found that a defendant conspired to distribute but was innocent of conspiring to import, and if the other six jurors found that defendant guilty of conspiring to import but innocent of either of the conspiracies to distribute, you could not return a verdict of guilty, since you would have failed to have unanimously agreed upon the commission of a single unlawful act.

In other words, before you can find a defendant guilty you must unanimously agree and find that the defendant conspired to violate a single federal statute set out in the indictment.

\*　\*　\*　\*　\*　\*

Proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges. What you must do is determine whether the conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the defendants. However, if you are satisfied that such a conspiracy existed, you must then determine who were the members of that conspiracy.

If you should find that a particular defendant was a member of another conspiracy, not the conspiracy charged in the indictment, then you must acquit that defendant. In other words, to find a defendant guilty you must find that he or she was a member of the conspiracy charged in the indictment.

In determining whether any defendant was a party to the conspiracy charged, each defendant is entitled to individual consideration of the proof respecting him, including any evidence of his knowledge or lack of knowledge, his status, his participation in key conversations, his participation in the plan, scheme or arrangements alleged in the indictment."

plied with the discovery requirements of the local rules and the Federal Rules of Criminal Procedure.

We hold that the toll records showing long distance calls between appellant's residence and Torreon, Mexico, were properly admitted. In the first place, although the government did not specifically list the particular toll calls in question, the entire set of all available phone records was made available and the prosecution indicated that it had only belatedly discovered the significance of the records. This demonstrates that the government was not withholding information in bad faith.

Rule 16, Fed.R.Crim.P., does not require that the prosecution disclose all the minutiae of its evidence, it does not require revelation of trial strategy; nor does the Rule require delineation of the government's case with total specificity. *United States v. Anderson*, 481 F.2d 685 (4th Cir. 1973); *United States v. Sherriff*, 546 F.2d 604 (5th Cir. 1977). The admission of evidence which has not been properly identified in any pretrial order or other procedure is largely a matter for the sound discretion of the trial judge. *Calamia v. Spivey*, 632 F.2d 1235 (5th Cir. 1980); *Clary v. Ocean Drilling & Exploration Co.*, 609 F.2d 1120 (5th Cir. 1980); *Davis v. Duplantis*, 448 F.2d 918 (5th Cir. 1971). Under the circumstances of this case, where the government's exhibit list included the general reference to all of the disputed telephone records and those records were made available to the defense, the trial judge did not abuse his discretion in admitting these records into evidence.

Similarly, there was no abuse of discretion in permitting the DEA agent to testify, even though his name was not included on the government pretrial witness list. The testimony of the witness was relevant and there was no alternate way to introduce evidence of the facts about which he testified. Every conceivable witness cannot always be anticipated before a criminal trial, particularly one of such length and complexity as this. The evidence offered was at most equivocal and the government offered to stipulate that the identity of the callers was unknown. Although Elam declined this offer of stipulation, he was able to demonstrate that numerous people had access to that telephone and that Elam himself did not necessarily place or receive the telephone calls in question. Under the circumstances, we find that the trial judge properly exercised his discretion in permitting the evidence of both the telephone calls and the testimony of the DEA agent to go to the jury. *United States v. Anderson*, 481 F.2d 685 (4th Cir. 1973); *United States v. Sherriff*, 546 F.2d 604 (5th Cir. 1977).

For the reasons detailed above, the conviction of each appellant is hereby

AFFIRMED.