UNITED STATES of America, Plaintiff-Appellee,

v.

Levino MICHELENA–OROVIO, Defendant-Appellant.

No. 81–3706.

United States Court of Appeals, Fifth Circuit.

March 25, 1983.

Rehearing Granted May 18, 1983.

Opinion on Rehearing En Banc, 5th Cir., 706 F.2d 502.

Randall, Circuit Judge, filed separate opinion concurring in part and dissenting in part.

**498**

---

Dymond, Crull & Castaing, Edward J. Castaing, New Orleans, La., for defendant-appellant.

Marilyn Gainey Barnes, Michael Schatzow, Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before WISDOM, RANDALL, and TATE, Circuit Judges.

PER CURIAM:

The defendant, a member of the crew of a vessel intercepted on the high seas by the Coast Guard and found to have a cargo of marijuana, challenges his conviction of conspiracy to import marijuana and conspiracy to possess marijuana with intent to distribute it. He claims: (1) that the trial court erred in denying his motion to suppress the evidence; (2) that the court erred in refusing to allow the jury to smell the sample bale of marijuana; and (3) that there was insufficient evidence to support his conviction. For the reasons set forth below, we affirm in part and reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

An undercover agent joined other law enforcement agents in Louisiana in pretending to be unloaders and truckers of marijuana who were seeking employment. They met with persons who represented themselves to be engaged in smuggling marijuana from Colombia, and who subsequently hired them to provide ships to meet at sea with other ships transporting marijuana. The smugglers informed the agents that a mother ship had departed from Colombia. The agents described the ship to Coast Guard personnel as a converted shrimp boat, approximately seventy-five feet long, with a white hull, its booms removed, and a cargo of marijuana. They informed the Coast Guard that the ship was traveling from Colombia to rendezvous with another vessel at a specific point on the high seas and to unload the marijuana for importation into the United States. Forty or fifty miles south of the rendezvous point, at a point approximately 200 miles southeast of New Orleans, personnel aboard the Coast Guard vessel, VALIANT, sighted a boat that met the agents' description. The boat was heading north toward the rendezvous site.

As the VALIANT neared the vessel, the VALIANT crew was able to identify the vessel as the ALEX LUZ. The lights on the vessel had been reversed so that it appeared to be moving in the direction opposite to its actual course. The ALEX LUZ, presumably after it sighted the VALIANT, changed its course radically from due north to due south. After the VALIANT unsuccessfully attempted to communicate with the ALEX LUZ by radio, it came alongside the vessel and requested permission to board, which was denied.

Since the ALEX LUZ was flying the Venezuelan flag, the personnel on the VALIANT obtained permission to board from the Venezuelan government, as well as permission to search the vessel and detain it if marijuana or contraband were found. The VALIANT then attempted to communicate by radio with the ALEX LUZ, but received no response. Finally, the VALIANT crew told the ALEX LUZ to stop because the Coast Guard had permission to board the vessel.

When the ALEX LUZ did not stop, the VALIANT crew made several attempts to force a halt, including firing shots into the air and throwing lines into the propeller. After the Coast Guard hosed the vessel, sending water into its smokestack, the boat finally came to a stop. Eight Colombians, including the defendant, Levino Michelena-Orovio, came out of the cabin with their bags packed and sat on the stern of the vessel.

There was apparently no marijuana on the deck of the ALEX LUZ, but Lieutenant Shuck testified at trial that he could smell marijuana when he boarded the vessel. When Lieutenant Shuck asked for the captain of the ALEX LUZ, Oscar Romero, one of the persons aboard who had previously spoken with the Coast Guard crew, responded that there was no captain and that the boat had no official papers. The Coast Guard found 363 bales of marijuana in the hold of the vessel. Government witnesses valued the marijuana at approximately four to six million dollars.

On September 25, 1981, Michelena-Orovio and others were charged in a three-count superseding indictment with conspiracy to import marijuana into the United States, attempting to import marijuana into the United States and conspiracy to possess marijuana with intent to distribute it, in violation of 21 U.S.C. §§ 963 and 846 (1976), respectively. Michelena-Orovio's pretrial motion to suppress the evidence was subsequently denied. On October 9, 1981, a jury convicted Michelena-Orovio on the two conspiracy counts. The court sentenced him to a four-year term of imprisonment on the first conspiracy count and a five-year term on the second. Imposition of sentence on the latter count was suspended and the defendant was placed on inactive probation for five years, to commence upon his release from custody. The government's subsequent motion to dismiss the substantive count of the indictment was granted. Michelena-Orovio appealed.

## II. THE MOTION TO SUPPRESS.

The district court denied the motion to suppress the marijuana, ruling that there was reasonable suspicion for the search of the ship's hold. Michelena-Orovio argues that there was not a reasonable suspicion

that the ALEX LUZ was involved in a crime against the United States.

■ The evidence available to the Coast Guard did give it reasonable grounds for suspicion that such a crime was intended. Coast Guard personnel had been informed by undercover agents that a converted shrimp boat, closely resembling the ALEX LUZ, was traveling from Colombia to rendezvous with another vessel at a specific point and unload the marijuana for importation into the United States. The ALEX LUZ was sighted forty to fifty miles south of the rendezvous point heading north toward the site. Thereafter, the ALEX LUZ changed its course. Even when informed that the Venezuelan authorities had given their permission to search, the boat attempted to avoid a search. The combination of these facts was sufficient to create a reasonable suspicion that a crime against the United States was intended.[1]

Moreover, Michelena-Orovio probably does not have standing to assert the fourth amendment issue because it is questionable whether, as a mere crew member, he had a legitimate expectation of privacy in cargo stowed in the hold of the converted shrimping vessel. *United States v. DeWeese*, 5 Cir.1980, 632 F.2d 1267, 1270, *cert. denied*, 1981, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188, and cases cited therein; *United States v. Freeman*, 5 Cir.1981, 660 F.2d 1030, 1034. We have held that crew members have no legitimate expectation of privacy in those areas of a commercial vessel which are subject to the common access of those legitimately aboard the vessel. *DeWeese, supra.*

## III. THE REFUSAL TO ALLOW THE JURY TO SMELL THE BALE.

■ Michelena-Orovio next contends that the district court erred in refusing his request to permit the jury to smell one of the

1. Although the defendant has not raised the issue, we also note the existence of the requisite statutory authority for the Coast Guard to seize and search the ALEX LUZ. *United States v. Williams*, 5 Cir.1980, 617 F.2d 1063, 1074 (en banc). A federal statute, 14 U.S.C. § 89(a) (1976), authorizes the Coast Guard to stop and search a foreign vessel on the high

seas if they have reason to believe that those aboard are involved in a conspiracy to import contraband into the United States.

Even if authority had not existed under § 89(a), the Coast Guard's actions would have been authorized by Venezuela's consent. *Williams*, 617 F.2d at 1077.

363 bales of marijuana. He argues that the evidence was probative on the issue of whether marijuana could be smelled aboard the ALEX LUZ at the time of boarding.

The ruling was not in error. Rule 403 of the Federal Rules of Evidence provides in pertinent part that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The district court properly excluded the evidence because the conditions of the proposed experiment differed substantially from those aboard the ALEX LUZ. The marijuana was then one year old and the courtroom experiment would have involved only one bale, not the 363 bales found on the vessel. The experiment was to take place in a courtroom rather than on a small vessel at sea. We have held that it is proper to refuse to allow such an experiment if the conditions of the proposed experiment differ substantially from those existing at the time the officer smelled the marijuana. *See United States v. Cantu,* 5 Cir.1977, 555 F.2d 1327; *United States v. Torres,* 5 Cir.1976, 537 F.2d 1299; *United States v. Vallejo,* 5 Cir.1976, 541 F.2d 1164.

## IV. THE SUFFICIENCY OF THE EVIDENCE.

■ Finally, Michelena-Orovio contends that the evidence was insufficient to prove that he participated in conspiracies to import marijuana into the United States and to possess marijuana with intent to distribute it. The standard of review of the sufficiency of the evidence in a criminal case is whether a reasonably-minded jury must necessarily entertain a reasonable doubt as to defendant's guilt in light of the evidence produced at trial. In evaluating a claim of insufficient evidence according to this standard, we must consider the evidence in the light most favorable to the government. *Glasser v. United States,* 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; *United States v. Freeman,* 5 Cir.1981, 660 F.2d 1030. In a conspiracy case, the government must prove beyond a reasonable doubt "that a conspir-

acy existed, that the accused knew about it and, with that knowledge, voluntarily joined it." *United States v. Rodriguez,* 5 Cir., 585 F.2d 1234, 1245 (*quoting United States v. White,* 5 Cir.1978, 569 F.2d 263, 267), *aff'd,* 5 Cir.1978, 612 F.2d 906 (en banc), *aff'd sub nom. Albernaz v. United States,* 1981, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275. In a conspiracy prosecution under 21 U.S.C. § 963 or 21 U.S.C. § 846, there is no need to allege or prove overt acts, *Rodriguez,* 585 F.2d at 1245, *aff'd,* 612 F.2d at 919 n. 37, or to produce direct evidence of the conspiracy. *Glasser, supra.* Further, the government is "not required to prove ... knowledge of all the details of the conspiracy or each of its members, provided that [the] prosecution established his knowledge of the essential[s] of the conspiracy." *United States v. Alvarez,* 5 Cir.1980, 625 F.2d 1196, 1198 (en banc) (citation omitted.)

■ We have held that a conspiracy to import marijuana may be proven by a showing sufficient to infer knowledge of the existence of the illegal cargo. The probable length of the voyage, the quantity of marijuana on board, and the relationship between the captain and his crew are all factors from which a jury can infer the requisite knowledge. *United States v. Freeman, supra; United States v. Mazyak,* 5 Cir.1981, 650 F.2d 788, *cert. denied,* 1982, 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464; *United States v. Alfrey,* 5 Cir., 620 F.2d 551, *cert. denied,* 1980, 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160.

### A. *The Conspiracy to Import.*

■ The evidence in this case is more than sufficient to establish Michelena-Orovio's guilt of conspiracy to import. The voyage of the ALEX LUZ was at least five days long. The Coast Guard discovered over twelve tons of marijuana aboard the seventy-five foot boat. The jury could infer from the length of the voyage and size of the vessel a close relationship between the captain and the crew.

■ While a crew member may be convicted of conspiracy to import marijuana

merely on the basis of his presence on a ship loaded with a large amount of contraband, *United States v. Bland,* 5 Cir., 653 F.2d 989, *cert. denied,* 1981, 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592; *United States v. Willis,* 5 Cir.1981, 639 F.2d 1335, the government has established more than mere presence in this case. There was evidence that the odor of marijuana permeated the small vessel. In both *Bland* and *Willis* the hold containing the illegal cargo was sealed shut and there was no testimony at trial in either case that the odor of marijuana could be detected. Further, there were other suspicious facts concerning the ALEX LUZ. When the Coast Guard first spotted the vessel, it had its lights reversed so that it appeared to be going in the direction opposite to its actual course. The logical explanation for this unusual lighting practice was that the boat was attempting to escape detection. This suspicion was confirmed when the boat changed direction as soon as its crew became aware of the Coast Guard's presence.

The situation on board was hardly likely to dispel the suspicions aroused by the boat's outward appearance. Besides the fact that the boat apparently reeked of marijuana, there was no fishing equipment aboard and no cargo other than the contraband. Consequently, it could be inferred that Michelena-Orovio, as a crew member, was hired to handle the marijuana, the only cargo on board. In addition, all eight persons aboard the ALEX LUZ, including the defendant, acted in concert, when they came on deck with their bags packed. They all agreed that there was no captain aboard the vessel. The jury could infer that the group acted in concert to conceal the identity of the captain.

### B. *The Conspiracy to Possess with Intent to Distribute.*

The final contention of Michelena-Orovio is that there was not sufficient evidence to convict him of conspiring to possess marijuana with intent to distribute it in the United States. The contention poses a dilemma, for this Court has developed two distinct lines of precedent as to the evidence that is sufficient to warrant conviction for the offense when the accused is a member of the crew of a ship apprehended with contraband on the high seas. One line of cases, starting with *United States v. Cadena,* 5 Cir.1978, 585 F.2d 1252, has held that the government cannot rely only on the size of the cache to prove the elements of a conspiracy to possess contraband with intent to distribute it in the United States. The other line of cases, starting with *United States v. Mann,* 5 Cir.1980, 615 F.2d 668, *cert. denied,* 1981, 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193, held, without discussing *Cadena,*[2] that the jury may infer, from the size of the cache, intent to distribute the contraband, knowledge of the conspiracy, and agreement to join the conspiracy. We choose to resolve this conflict by following *Cadena* because it is the first of our cases to consider the problem before us, has never been specifically overruled, and is in our view better-reasoned than *Mann* and its progeny.[3]

**2.** The most recent case discussing *Cadena* is *United States v. Chaparro-Almeida,* 5 Cir.1982, 679 F.2d 423. The defendants in *Chaparro-Almeida* were Columbian nationals who brought a marijuana-laden vessel to within seven miles of the Louisiana coast. The Coast Guard stopped the vessel while it was waiting to deliver the marijuana to two Americans who had left the boat to arrange for the delivery of the contraband to the United States. The Court did not discuss the conflicting case law in the circuit, but affirmed the convictions for conspiracy to import and conspiracy to possess marijuana with intent to distribute it in the United States. The Court, however, distinguished *Cadena,* noting that the vessel in *Cade-* na was 200 miles offshore and that there was no supporting evidence of an intention to deliver the contraband to the United States. 679 F.2d at 430.

**3.** We recognize that

[a]s a panel of this Court, we are without power to overrule a decision of another panel. That task falls solely to the full court sitting *en banc. Ford v. United States,* 618 F.2d 357, 361 (5th Cir.1980). Neither can one panel 'disregard the precedent set by a prior panel, even though it conceives error in the precedent. Absent an overriding Supreme Court decision or a change in the statutory law, only the Court sitting *en banc* can do

In *Cadena,* we reversed the conviction of a sea captain whose ship had transferred a large quantity of marijuana to a smaller craft at a point 200 miles south of the Florida coast. The *Cadena* Court, speaking through Judge Alvin Rubin, was unwilling to infer knowledge of and participation in a conspiracy to possess marijuana with intent to distribute based on the size of the cache without greater proof of a knowing agreement to join that conspiracy:

> As to Cadena, . . . , there was no evidence that he knew of a distribution scheme when he conspired to import the marijuana. Unlike the situation presented by an ongoing enterprise, Cadena had no interest in or awareness of what plans, if any, had been reached to dispose of the marijuana once he reached these shores. Although a conspiracy to import facilitates a conspiracy to distribute, one cannot [join] a conspiracy, whether by conduct or verbal accord, unless one knows that it has in fact been concocted.... [F]rom Cadena's perspective, it was not apparent that any accord had yet been reached, either tacitly or otherwise.

585 F.2d at 1266.

*United States v. Rodriguez,* 5 Cir., 585 F.2d 1234, 1245, aff'd, 1978, 612 F.2d 906 (en banc), *aff'd sub. nom. Albernaz v. United States,* 1981, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275, was a companion case to *Cadena.* *Rodriguez* involved the prosecution of four persons who were to receive the marijuana on Cadena's boat. Although we affirmed the convictions of two defendants for conspiracy to possess with intent to distribute, we reversed the convictions of two men who had not specifically made arrangements to participate in the distribution of the marijuana. Again speaking through Judge Rubin, we said:

However, there was literally no evidence with respect to the involvement of Martins and Smigowski in a distribution scheme except what might be inferred from their participation in an agreement to import it. The direct and circumstantial evidence that they were peripheral participants in the importation scheme does not refute, beyond a reasonable doubt, the hypothesis that they had no knowledge of a conspiracy to distribute once it reached these shores.

Unlike Rodriguez and Albernaz, who perforce had to make some arrangements to dispose of their treasure, Smigowski and Martins could each receive his reward and be done with the scheme. Unlike Rodriguez and Albernaz, who, according to the evidence, had contacts outside the Miami area, needed front money, and planned to use Winnebagos, Smigowski or Martins were not shown to have been connected with the actual arrangements for importation.

There was evidence that Smigowski and Martins were parties to the importation scheme, but there is no evidence that would establish beyond reasonable doubt that they would likely come in possession of the haul once it arrived, share in its proceeds thereafter, or other evidence from which it could in turn be inferred that they were privy to plans to distribute the contraband. We have already noted that possession of a large supply of a prohibited substance may justify the inference that the possessor intended to distribute it, but there was no evidence that Smigowski and Martins had sufficient dominion over or interest in the marijuana to warrant the inference.

585 F.2d at 1247 (affirmed in pertinent part, 612 F.2d at 908–09 n. 3).[4] In both

---

this.' *Davis v. Estelle,* 529 F.2d 437, 441 (5th Cir.1976).
*Washington v. Watkins,* 5 Cir.1981, 655 F.2d 1346, 1354 n. 10. As in *Washington,* we cannot follow "one line of precedent without disregarding the other, and we lack the authority to overrule one line at the other's expense." *Id.*

**4.** Judge Brown for the Court en banc stated:

The panel properly found the evidence insufficient to show the involvement of Smigowski and Martins in a conspiracy involving distribution of the marijuana, once it actually reached the United States. Their conviction on Count II was therefore properly reversed. But Rodriguez and Albernaz "perforce had to make some arrangements to dispose of their treasure," 585 F.2d 1247, and those two actu-

*Cadena* and *Rodriguez,* the Court was unwilling to infer that there was an agreement to distribute marijuana based on the existence of the conspiracy to import and on the size of the cache without more evidence of the defendants' involvement in the distribution scheme.

Several subsequent opinions are inconsistent with *Cadena* and *Rodriguez.* In *United States v. Mann,* 5 Cir.1980, 615 F.2d 668, *cert. denied,* 1981, 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193, the Court held that the defendants, who were American citizens, were properly convicted of conspiracy to possess marijuana with intent to distribute it in the United States when they were caught at sea on an American vessel loaded with 22,500 pounds of marijuana. The Court reasoned that the mere size of the cache and the presence of a conspiracy to import the marijuana allowed the jury to infer intent to distribute and participation in a conspiracy to distribute. In a number of cases after *Mann,* this Court has followed *Mann* to reach this same result. See, for example, *United States v. Mazyak,* 5 Cir. 1981, 650 F.2d 788, *cert. denied,* 1982, 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464; *United States v. Shelnut,* 5 Cir.1980, 625 F.2d 59, *cert. denied,* 1981, 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 818.

The government contends that *Mann* and its progeny are better-reasoned and more consistent with conspiracy law than *Cadena* and *Rodriguez.* The government argues that an agreement to possess marijuana with intent to distribute may be inferred from the quantity of marijuana imported. In this case, twelve tons of marijuana is more than a mere mortal crew of eight could ever consume; therefore, the members of the crew intended to join in the scheme to distribute the contraband. In the absence of a legal market to dispose of the contraband, there is no reason to import unless there is a plan for distribution. Finally, the government argues that the act of importation is in furtherance of the conspiracy to possess with intent to distribute, for there would be no distribution without marijuana to distribute. The government overlooks the gulf between the rational inference that someone would distribute the imported marijuana and the irrational inference that an ordinary member of the crew knowingly and intentionally joined the scheme to distribute the marijuana.

The government relies partially on *United States v. Bruno,* 2 Cir.1939, 105 F.2d 921, *rev'd on other grounds,* 1939, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257, to argue that conspiracies to distribute narcotics should be analyzed as chains or interconnected links—conspiracies in which a participant in part of the conspiracy may be convicted of participation in the whole. In *Bruno,* the defendants were convicted of a conspiracy to import, sell, and possess narcotics. The defendants argued that separate conspiracies were involved—one between the smugglers and the middlemen and one between the middlemen and each group of retailers. The Court rejected this argument and recognized the interdependence of participants in a drug distribution scheme:

> The evidence did not disclose any cooperation or communication between the smugglers and either group of retailers, or between the two groups of retailers themselves; however, the smugglers knew that the middlemen must sell to retailers, and the retailers knew that the middlemen must buy of importers of one sort or another. Thus the conspirators at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew that it had not begun with their sellers. That being true, a jury might have found that all the accused were embarked upon a venture, in all parts of which each as a participant, and an abettor in the sense that the success of that part with which he was immediately concerned, was dependent upon the success of the whole.

ally arranged (without the involvement of Smigowski or Martins) to transport, by means of Winnebagos, and distribute the marijuana once it reached shore. The panel

therefore properly found the evidence sufficient with respect to both counts of the convictions of Rodriguez and Albernaz.
*Rodriguez,* 612 F.2d at 909 n. 3.

105 F.2d at 922. The government argues that *Bruno* and other cases [5] support the holding that suppliers of narcotics such as Michelena-Orovio may be convicted for participation in the entire distribution scheme. This is a question-begging argument.

■ The issue is whether a jury could reasonably infer that a crew member of a vessel on the high seas knowingly and voluntarily joined the conspiracy to distribute and had the required intent to distribute based on the size of the cache and his participation in the conspiracy to import. "An inference is a deduction, warranted by human reason and experience, that the trier of fact may make on the basis of established facts—a process of reasoning from premise to conclusion without the directive force of a rule of law, which characterizes a presumption." Louisell, Construing Rule 301: Instructing the Jury on Presumptions in Civil Actions and Proceedings, 63 Va.L. Rev. 281 (1977). "In the case of an inference, the existence of B may be deduced from A by the ordinary rules of reason and logic." 1 J. Weinstein & M. Berger, Weinstein's Evidence § 300[01]. The effect of an inference, if any, "is based upon logic and experience, not upon law". Gausewitz, Presumptions in a One-Rule World, 5 Vand. L.Rev. 324, 327 (1952). To be legitimate or permissible, an inference must be deduced as a logical consequence of facts presented in evidence, and there must be a logical and rational connection between the facts in evidence and the fact to be inferred. *Equal*

*Employment Opportunity Commission v. Greyhound Lines, Inc.,* 3 Cir.1980, 635 F.2d 188, 194; *see National Industries, Inc. v. Republic National Life Insurance Co.,* 9 Cir. 1982, 677 F.2d 1258, 1267; *Fenner v. General Motors Corp.,* 5 Cir.1981, 657 F.2d 647, 651, *cert. denied,* 1982, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653; *Wilson v. Winstead,* E.D.Tenn.1978, 470 F.Supp. 263, 268.[6]

Based on logic and common experience, evidence that a crew member was caught on the high seas in a conspiracy to import marijuana does not warrant the inference that he knew of or voluntarily agreed to join a conspiracy to distribute marijuana in the United States. The size of the cache may allow an inference that someone at some unknown location plans to distribute the marijuana, but it does not warrant pyramiding an inference that a mere crew member was such a person nor does it refute beyond a reasonable doubt the hypothesis that he did not join in the conspiracy or even know of it. When there is no evidence that a crew member had a stake in the venture or awareness of or interest in the distribution of the contraband, the logical inference is that the crew member joined in a conspiracy to import marijuana to a point on the high seas without any knowledge of, joinder in, or participation in the conspiracy to distribute. This inference is especially rational with respect to Michelena-Orovio because he lacked any contacts with the United States at all. This case is even

---

**5.** The government also relies on *United States v. Martino,* 2 Cir.1981, 664 F.2d 860, 876, *cert. denied,* 1982, 102 S.Ct. 3493, and *United States v. Elam,* 5 Cir.1982, 678 F.2d 1234, 1246, to support the argument that suppliers are aware that they are participating in a collective venture.

**6.** One influential commentator has argued that the use of permissive inferences may even interfere with the fact-finding process in criminal cases:

> The key problem with permissive inferences is that they isolate and abstract a single circumstance from the complex of circumstances presented in any given case, and, on proof of that isolated fact, authorize an inference of some other fact beyond reasonable doubt. Conviction is authorized by the permissive inference in all cases in which the

predicate fact appears, even though the correlation between the predicate fact and the element to be inferred is less than perfect. Permissive inferences thus permit juries to avoid assessing the myriad facts which make specific cases unique. Analysis, as Supreme Court opinions demonstrate, is drawn to likelihoods. The thesis pursued here is that any structure which reduces criminal cases to a simplified assessment of what might be called the "chances of guilt" is fundamentally at odds with the concept of reasonable doubt, and hence to be discouraged as a mode of determining the ultimate question of guilt or innocence.

Nesson, Reasonable Doubt and Permissive Inferences: The Value of Complexity, 92 Harv.L. Rev. 1187, 1192 (1979) (footnote omitted).

stronger than *Cadena* because here the parties stipulated that the defendant, unlike Cadena, was not the captain of the vessel. It is stronger than *Rodriguez* because the defendants acquitted of the conspiracy to distribute in that case were Americans who were more actively involved than Michelena-Orovio in the conspiracy to import.

We conclude that the reasoning of *Cadena* is logical and does not require an attenuated chain of inferences to justify its result. This result comports with this Court's admonition that " 'proof of an agreement to enter a conspiracy is not to be lightly inferred.' " *United States v. White,* 5 Cir. 1978, 569 F.2d 263, 267 (quoting *United States v. Johnson,* 5 Cir., 439 F.2d 885, 888, cert. denied, 1971, 404 U.S. 880, 92 S.Ct. 213, 30 L.Ed.2d 161), reversing a conviction under 21 U.S.C. § 846 for conspiracy to possess heroin with intent to distribute because of insufficient evidence of the existence of the conspiracy.

The rationale of *Cadena* is also consistent with the general law of conspiracy. In *Direct Sales Co. v. United States,* 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674, a drug manufacturer and wholesaler had supplied large amounts of morphine sulphate to a doctor for several years. The government charged the manufacturer with conspiracy to distribute narcotics unlawfully because the amounts of morphine supplied were so large that the manufacturer must have known that the doctor was distributing them illegally.[7] The court held that:

> When the evidence discloses such a system, *working in prolonged cooperation* with a physician's unlawful purpose to supply him with his stock in trade for his illicit enterprise, there is no legal obstacle to finding that the supplier *not only knows and acquiesces, but joins both mind and hand with him to make its accomplishment possible.* The step from knowledge to intent and agreement may be taken. There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern. *There is informed and interested cooperation, stimulation, instigation, and there is also a "stake in the venture" which, even if it may not be essential, is not irrelevant to the question of conspiracy.*

319 U.S. at 713, 63 S.Ct. at 1270, 87 L.Ed. at 1682 (footnote omitted and emphasis supplied).

There was no evidence in *Cadena* of prolonged cooperation or of the defendant's stake in the venture.[8] Cadena had no concern as to what was to become of the contraband, and his involvement would have come to an end when the narcotics were delivered on the high seas. The Court in *Direct Sales,* like the Court in *Cadena,* recognized that "not every instance of sale of

---

7. The Court in *Direct Sales* discussed a previous decision, *United States v. Falcone,* 1940, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128. In *Falcone,* suppliers of sugar and yeast to illegal distillers were charged with conspiracy to distill spirits in violation of the revenue laws. The *Direct Sales* court summarized the *Falcone* holding rejecting this theory:

> [The *Falcone*] decision comes down merely to this, that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge that the buyer will use the goods illegally.

319 U.S. at 709; 63 S.Ct. at 1268, 87 L.Ed. at 1680.

The *Direct Sales* opinion distinguished the act of supplying narcotics from the supply of sugar and yeast involved in *Falcone.* Because the narcotics were heavily regulated, there was a greater inference that the distributor knew the doctor would use the goods illegally and that the distributor intended to further, promote and cooperate in the illegal enterprise. *Falcone,* however, stresses that more than a disinterested knowledge that goods supplied may be put to an unlawful use is required to convict a defendant of participating in a conspiracy to distribute.

8. *United States v. Bruno* is distinguishable from *Cadena* and *Michelena-Orovio* on this ground. In *Bruno,* an ongoing scheme to import and distribute narcotics was shown. Because the arrangement extended over a long period and because the suppliers must have known that the unlawful conduct would not stop with them, there was no question that the arrangements for distribution had been made. In addition, a continuing relationship between supplier and retailer gives each group a "stake" in the successful endeavors of the other. The government's reliance on *Bruno,* therefore, is misplaced.

restricted goods ... in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy". *Direct Sales,* 319 U.S. at 712, 63 S.Ct. 1269, 87 L.Ed. at 1682. Cadena's involvement, and that of Michelena-Orovio, is more like the conduct discussed in *Direct Sales* which was found to be insufficient to constitute a conspiracy:

> This may be true, for instance, of single or casual transactions, not amounting to a course of business, regular, sustained and prolonged, and involving nothing more on the seller's part than indifference to the buyer's illegal purpose and passive acquiescence in his desire to purchase, for whatever end. A considerable degree of carelessness coupled with casual transactions is tolerable outside the boundary of conspiracy. There may also be a fairly broad latitude of immunity for a more continuous course of sales, made either with strong suspicion of the buyer's wrongful use or with knowledge, but without stimulation or active incitement to purchase.

319 U.S. at 712 n.8, 63 S.Ct. at 1269–70 n.8, 87 L.Ed. at 1682 n.8. *Direct Sales* supports the conclusion of *Cadena* that a disinterested knowledge that goods supplied may be put to an unlawful use is insufficient to convict a supplier of participation in a conspiracy to distribute.[9]

Under *Cadena,* the conviction of Michelena-Orovio for conspiracy to possess marijuana with intent to distribute must be reversed for lack of evidence. Like *Cadena,* this case involves a single transaction and not prolonged cooperation with a distributor. There is no evidence that Michelena-Orovio had a stake in the proceeds of the distribution or had any involvement in or knowledge of the scheme to distribute the marijuana once it was in the United States. As far as the record goes, it was more probable than not that Michelena-Orovio, who lives with his family in Colombia [10] and speaks no English, agreed only to serve as a crew member on a vessel delivering marijuana to a point 150–200 miles off the coast of the United States and to return home thereafter. The facts of this case do not warrant the inference that Michelena-Orovio was part of a conspiracy to distribute but are at war with this inference. *See Fenner,* 657 F.2d at 651. Whether his conduct was, in itself, illegal (a violation of the law against conspiracy to import) is irrelevant to his state of mind with respect to another crime (the later violation of the law against conspiracy to distribute). At most, the defendant was indifferent as to any distribution scheme. His involvement began and ended on a ship two hundred miles from the United States. We conclude that a reasonably-minded juror could not rationally find a knowing and voluntary agreement to join a conspiracy to possess marijuana with intent to distribute it within the United States merely from the fact that a Columbian national is a crew member of a foreign vessel delivering a large load of marijuana to a point on the high seas.

*Conclusion*

In final analysis, as the Supreme Court has put it, criminal substantive due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged". *In re Winship,* 1970, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375. This conceptual framework is necessarily broad for it to be meaningfully applied in every criminal case. In its application to a conspiracy charge a certain minimum requirement of

---

**9.** The government contends that it is not necessary to have an ongoing venture in order to establish involvement in a plan for distribution. In the context of the importation of a large quantity of marijuana, it contends that the required interest in the distribution scheme is supplied by the fact that the cargo cannot be disposed of unless such a scheme exists. This argument misconstrues both *Cadena* and Michelena-Orovio's defense. The argument is not that the defendant knew of the conspiracy but claims not to have joined it. Instead, the argu-

ment is that the defendant did not know whether a conspiracy to distribute had been formed or not. Even if Michelena-Orovio knew of the conspiracy, under *Direct Sales* there must be. "informed and interested cooperation" rather than "knowledge, acquiescence, carelessness, indifference, lack of concern" to find he is guilty of joining it.

**10.** *See* Trial Transcript at 22 (opening statement of Edward Castaing, attorney for Michelena-Orovio).

mens rea is a "fact necessary to constitute the crime of which [the defendant] is charged". *Id.* at 364, 90 S.Ct. at 1073, 25 L.Ed.2d at 375. Here, based on the amount of marijuana seized, it was rational for the jury to infer a conspiracy to import the marijuana, a scheme in which Michelena-Orovio knowingly participated as a seaman on the vessel. But it was irrational for the jury to infer beyond a reasonable doubt that this lowly, non-English speaking seaman knew about the plan to distribute the marijuana in the United States or had an intention of joining in any such plans.

We affirm Michelena-Orovio's conviction for conspiracy to import marijuana into the United States and reverse his conviction for conspiracy to possess marijuana with intent to distribute it in the United States. We emphasize that the facts of particular cases are extremely important in determining the sufficiency of the evidence to prove a conspiracy. Our concern is that conspiracy convictions not be based on an inference B that is not logically or by experience linked with predicate A.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

RANDALL, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I, II, III and IV.A of the majority opinion. I respectfully dissent from the panel's decision, in Part IV.B of the majority opinion, to reverse Michelena-Orovio's conviction for conspiracy to possess marijuana with intent to distribute it in the United States.

The majority recognizes that Michelena-Orovio's challenge to his conviction of conspiracy to possess marijuana with intent to distribute it "poses a dilemma, for this Court has developed two distinct lines of precedent as to the evidence that is sufficient to warrant conviction for [this] offense ...." 702 F.2d at 501. One line of cases holds that once the jury has determined that the defendant was involved in the conspiracy to import contraband, it is entitled to conclude that the defendant was also a participant in the conspiracy to dis-

tribute on the basis of the quantity of marijuana imported. *See e.g., United States v. Mazyak,* 650 F.2d 788 (5th Cir.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); *United States v. Mann,* 615 F.2d 668 (5th Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981). Two other cases have held that participation in the conspiracy to distribute *cannot* be inferred solely from participation in the conspiracy to import a large quantity of marijuana. *United States v. Cadena,* 585 F.2d 1252 (5th Cir.1978); *United States v. Rodriguez,* 585 F.2d 1234 (5th Cir.), *aff'd,* 612 F.2d 906 (en banc), *aff'd* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). The majority has chosen to resolve this conflict by following *Cadena,* "because it is the first of our cases to consider the problem before us, has never been specifically overruled, and is in [the majority's] view better-reasoned than *Mann* and its progeny." at 501. I would reach the opposite conclusion.

## I. THE MORE BINDING PRECEDENT.

The majority claims that *Cadena* was the earliest precedent to deal with the problem before us. *Cadena* was the first case only to the extent that it dealt with the conviction of a foreign crew member found on board a marijuana-laden boat outside United States territorial waters. Long before *Cadena* was decided, we had held that persons could be convicted of conspiracy to possess with intent to distribute on the basis of the size of the cache. *See, e.g., United States v. Cortez,* 521 F.2d 1, 4 (5th Cir. 1975) (affirming conviction on one count of conspiracy to import and to possess with intent to distribute of owner of automobile who was present at arrival of boat carrying 300 pounds of marijuana, and stating that distribution was established by the fact that it was "virtually impossible for two mere mortals to consume 300 pounds of marijuana, personally, within a reasonable span of time"); *United States v. Maslanka,* 501 F.2d 208 (5th Cir.1974), *cert. denied,* 421 U.S. 921, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975) (affirming convictions of conspiracy

to possess with intent to distribute and possession of persons observed on a beach where 18,000 pounds of marijuana was floating, but reversing convictions of conspiracy to import and importation because there was not sufficient evidence that the contraband came from a foreign source); *see also United States v. Perry,* 480 F.2d 147 (5th Cir.1973) (affirming conviction of substantive offense of possession with intent to distribute and holding that the size of the cache could support the inference that the contraband was not solely for personal use); *United States · v. Mather,* 465 F.2d 1035 (5th Cir.), *cert. denied,* 409 U.S. 1085, 93 S.Ct. 685, 34 L.Ed.2d 672 (1972) (same). *Cadena* is the "first case" only to the extent that any case may be considered as the first based on its unique set of facts. The doctrine of *stare decisis* precludes such a broad understanding of "first case."

While the majority notes that *Cadena* and *Rodriguez* have never been specifically abandoned, they appear to have been overruled *sub silentio,* since there has been no case that has followed either precedent for the proposition that the amount of contraband imported cannot be the sole basis for connecting a defendant to an existing conspiracy to distribute. The cases have either attempted to distinguish *Cadena, see United States v. Chaparro-Almeida,* 679 F.2d 423 (5th Cir.1982) (convictions affirmed where marijuana-laden vessel was stopped within seven miles of the Louisiana coast while boat was waiting to deliver marijuana to two Americans), or ignored it completely. *See United States v. Borchardt,* 698 F.2d 697 (5th Cir.1983) (affirming convictions of conspiracies to import and to possess with intent to distribute, and substantive offenses, of person who arranged importation of 481 pounds of marijuana from Mexico);[1] *United States v. Scott,* 678 F.2d 606 (5th Cir.1982) (affirming convictions of conspiracy to import and to possess with intent to distribute of some persons found on pleasure boat that contained 30,-000 pounds of marijuana, but reversing con-

victions of those defendants not shown to have knowledge of the cargo); *United States v. Escobar,* 674 F.2d 469 (5th Cir. 1982) (affirming convictions of crew—and captain—on shrimp boat, where the boat had left a foreign port with at least four tons of marijuana and docked in Mississippi without it); *United States v. Hernandez,* 668 F.2d 824 (5th Cir.1982) (affirming conviction of person who got off of a boat that contained thirteen bales of marijuana and five boxes of methaqualone tablets, where he had keys to the cabin where the contraband was kept and had a station wagon on land waiting to transport the boat); *Mazyak, supra* (affirming convictions of captain and crew found on forty-two foot trawler laden with 14,611 pounds of marijuana; the trawler had left Miami nineteen days before it was stopped seventy miles south of Cuba); *United States v. Shelnut,* 625 F.2d 59 (5th Cir.1980), *cert. denied,* 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 818 (1981) (citing *United States v. Love,* 599 F.2d 107 (5th Cir.), *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 312 (1979)) (affirming convictions of defendants who were found on a shrimping vessel headed toward Texas, where the boat contained no shrimping equipment or shrimp, but did contain fifteen tons of marijuana). Other cases have cited *Rodriguez* for the contrary proposition, i.e., that participation in the conspiracy to possess with intent to distribute may be inferred from the size of the cache. In *Mann, supra,* we held:

> The defendants were apprehended with over 22,500 pounds of marijuana in their possession, far too much for the personal consumption of four individuals. Having determined that defendants planned to import their cargo, the jury was entitled to infer from the facts before it that some plan had been made for its disposition. As we have previously noted "[t]he very size of a . . . cache can be sufficient to show intent to distribute. . . ." *United States v. Rodriguez,* 585 F.2d 1234,

---

1. Judge Tate, who is a member of the majority in this case, was also a member of the panel

that affirmed Borchardt's conviction.

1246 (5th Cir.1978), *aff'd,* 612 F.2d 906 (5th Cir.1980) (en banc).

615 F.2d at 670 (other citations omitted); *see also United States v. Perez,* 648 F.2d 219 (5th Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981) (citing *Mann's* citation of *Rodriguez* in affirming convictions of conspiracy to possess with intent to distribute, where agents watched defendants unload 18,900 pounds of marijuana onto a conveyor belt behind a Florida beach house). Thus *Cadena* and *Rodriguez* stand alone for the proposition that a defendant cannot be convicted of conspiracy to possess with intent to distribute on the basis of the large quantity of contraband that he has imported.

Finally, the majority maintains that *Cadena* is the better-reasoned precedent. The majority heavily emphasizes the well-settled rule that "[t]o be legitimate or permissible, an inference must be deduced as a logical consequence of facts presented in evidence, and there must be a logical and rational connection between the facts in evidence and the fact to be inferred." at 504. Since I agree with the majority that an inference must flow logically from the facts, I set them forth at the outset of this dissent. One more well-settled principle must be kept in mind, however: a jury verdict should not be overturned lightly. The test for sufficiency of the evidence in this circuit is whether "a reasonable trier of fact could [have found] that the evidence establishe[d] guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.) (en banc), *cert. granted on other grounds,* —— U.S. ——, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982).

There is no doubt in this case about the existence of a conspiracy to distribute the marijuana found on board the ALEX LUZ. The customs agents were able to apprehend the vessel and her crew because the Florida-based importers had informed undercover agents, who were posing as persons interested in aiding in the distribution of marijuana, that the ALEX LUZ was carrying a cargo of contraband for distribution in the United States. The American importers gave the agents detailed information about the boat and the site planned for the rendezvous with a second boat; the second boat was supposed to bring the marijuana into the United States.

Michelena-Orovio himself was arrested on board a small vessel, the ALEX LUZ, that had just completed a relatively lengthy voyage from Colombia. The boat was laden with twelve tons of marijuana and reeked of its illicit cargo. Although the boat was a shrimping vessel, there was no fishing equipment aboard and no cargo other than the contraband. The marijuana was found in the ship's cargo hold. The cargo hatch was neither locked nor fastened, and there was open access to the cargo hold from the engine room of the vessel.

The ship's crew, including Michelena-Orovio, engaged in a concerted endeavor to elude capture and protect each other. When the Coast Guard first spotted the vessel, it had its lights reversed so that it appeared to be going in the direction opposite to its actual course, apparently in the hopes that it would escape detection. The boat changed direction as soon as its crew became aware of the Coast Guard's presence. When the agents came on board, all eight crew members were waiting on deck with their bags packed, and all eight insisted that there was no captain aboard the vessel.

The majority agrees that this "collocation of circumstances," *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), was sufficient to support Michelena-Orovio's conviction of conspiracy to import marijuana. The issue is whether those same circumstances, in particular the covert importation of a large quantity of marijuana, were sufficient to support the conviction of conspiracy to possess with intent to distribute the marijuana.[2] I con-

---

2. The fact that the defendant may be convicted of violating both conspiracy statutes by virtue of a single act does not violate the double

jeopardy clause of the United States Constitution. *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1980); *see also*

clude that they were, and that the line of cases permitting the inference of participation in the distribution conspiracy from participation in the conspiracy to import a large quantity of marijuana is the more consistent with the general law developed in this and other circuits concerning drug conspiracies. Further, the allowance of this inference does not infringe on the requirement that the government prove its case beyond a reasonable doubt. *See In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

## II. CONSPIRACY LAW: SPOKES AND CHAINS.

Conspiracy is an area of the law filled with figurative analogies, including chains and wheel parts. *See generally* Note, *"Single vs. Multiple" Criminal Conspiracies: A Uniform Method of Inquiry for Due Process and Double Jeopardy Purposes,* 65 Minn.L. Rev. 295 (1980); *Developments in the Law—Criminal Conspiracy,* 72 Harv.L.Rev. 920 (1959); W. LaFave & A. Scott, *Criminal Law* § 362, at 480–82 (1978). The question of the type of conspiracy involved is generally raised in a defendant's claim, similar to Michelena-Orovio's, that the government has proven not one but several conspiracies and that the defendant cannot be convicted of the conspiracies in which he did not participate.[3]

In *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the Supreme Court was confronted with the classic spoke conspiracy involving fraudulent loan schemes that revolved around one man, Brown. To use the analogy, Brown was the hub of the wheel, while the other defendants were the spokes. The government conceded that there was more than

one conspiracy, i.e. that there was no rim to connect the spokes, but it maintained that the defendants had not suffered substantial prejudice from being convicted of a single general conspiracy. The Supreme Court thought otherwise and reversed the convictions.

In contrast, the Supreme Court affirmed the convictions of participants in a chain or rimmed wheel conspiracy. *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). The defendants were convicted of a conspiracy to sell whiskey at prices above the ceiling set by government regulations. In distinguishing the factual situation in *Kotteakos,* the Court noted that Blumenthal and his colleagues were all involved in one scheme—to sell whiskey unlawfully—and that "the several agreements were essential and integral steps" in a single conspiracy. 332 U.S. at 559, 68 S.Ct. at 257.

Conspiracies to distribute narcotics have generally been considered to be prime examples of chain, or interconnected, conspiracies, in which a participant in a segment of the conspiracy may be convicted of participation in the whole. For example, in *United States v. Bruno,* 105 F.2d 921 (2nd Cir. 1939), *rev'd on other grounds,* 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939), the defendants were indicted for and convicted of a conspiracy to import, sell and possess narcotics. They argued that there were at least three separate conspiracies—one between the smugglers and the middlemen and one between the middlemen and each group of retailers. The Court of Appeals for the Second Circuit rejected the defendants' argument, specifically recognizing the interdependence of participants in a drug distribution scheme:

Missouri v. Hunter, —— U.S. ——, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). In *United States v. Borchardt,* 698 F.2d 697 at 702 (5th Cir.1983), we interpreted the defendant's double jeopardy argument as a challenge to the sufficiency of the evidence supporting his conviction. One suspects that the majority's holding that the evidence is insufficient to support Michelena-Orovio's conviction of conspiracy to possess with intent to distribute reflects wishful thinking about the double jeopardy implications of

conviction of both conspiracies. *See Rodriguez, supra,* 612 F.2d at 925 (Rubin, J., dissenting).

3. In most of these cases, the defendants claim that the variance between the government's proof at trial and the indictment was prejudicial and that the convictions must be reversed. *See, e.g., Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

The evidence did not disclose any cooperation or communication between the smugglers and either group of retailers, or between the two groups of retailers themselves; however, the smugglers knew that the middlemen must sell to retailers, and the retailers knew that the middlemen must buy of importers of one sort or another. Thus the conspirators at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew that it had not begun with their sellers. That being true, a jury might have found that all the accused were embarked upon a venture, in all parts of which each was a participant, and an abettor in the sense that the success of that part with which he was immediately concerned, was dependent upon the success of the whole.

105 F.2d at 922.

The Second Circuit has followed the *Bruno* rationale in more recent narcotics cases under the present statute:

> As we have long recognized, in many narcotics distribution networks the ultimate retailers may not know the identities of those who supply their wholesaler, and the retailers' identities may be unknown to those suppliers; but all are well aware that they are participating in a collective venture.

*United States v. Martino,* 664 F.2d 860, 876 (2d Cir.1981), *cert. denied,* — U.S. —, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). In our own circuit we have stated:

> Where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture, where there are several parts inherent in a larger common plan, or where *the character of the property involved* or the nature of the activity *is such that knowledge on the part of one member concerning the existence and function of other members of the same scheme is necessarily implied* due to the

overlapping nature of the various roles of the participants, the existence of a single conspiracy will be inferred.

*United States v. Elam,* 678 F.2d 1234, 1246 (5th Cir.1982) (citations omitted) (emphasis added). *See also United States v. Jabara,* 618 F.2d 1319 (9th Cir.), *cert. denied,* 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845 (1980). Thus, there is a line of precedent in a number of circuits, including our own, holding that the suppliers of narcotics may be convicted for participation in the entire distribution scheme.

The majority describes as "question-begging" the argument that "*Bruno* and other cases support the holding that suppliers of narcotics such as Michelena-Orovio may be convicted for participation in the entire distribution scheme." at 504. As the majority explains, the issue in this case is whether the jury could reasonably infer, on the basis of Michelena-Orovio's participation in the conspiracy to import twelve tons of marijuana, that he had knowingly and voluntarily joined the conspiracy to distribute it. Relying on *Direct Sales Co. v. United States,* 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), and *United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), the majority maintains that there is no evidence that Michelena-Orovio had the requisite "stake"[4] in the distribution scheme to connect him to the conspiracy to distribute. It emphasizes the absence of prolonged cooperation in this case in support of its conclusion that the defendant was at most "indifferent" to the contraband's ultimate destination.

The majority admits, however, that *Direct Sales* recognized that the strength of an inference of participation in the illicit conspiracy based on the sale of goods to the conspirators is dependent on the nature of the goods sold. Because the narcotics in *Direct Sales* were heavily regulated, there was a greater inference that the distributor knew that the buyer would use the goods illegally and that the distributor intended to further, promote and cooperate in the buyer's misuse of the commodity:

---

**4.** The continued vitality of *Falcone*'s "stake in the venture" requirement is open to question.

*See Developments in the Law, supra,* at 931–32.

The commodities sold [in *Falcone*] were articles of free commerce, sugar, cans, etc. They were not restricted as to sale by order form, registration, or other requirements. When they left the seller's stock and passed to the purchaser's hands, they were not in themselves restricted commodities, incapable of further legal use except by compliance with rigid regulations, such as apply to morphine sulphate. The difference is like that between toy pistols or hunting-rifles and machine guns. All articles of commerce may be put to illegal ends. But all do not have inherently the same susceptibility to harmful and illegal use. Nor, by the same token, do all embody the same capacity, from their very nature, for giving the seller notice the buyer will use them unlawfully. Gangsters, not hunters or small boys, comprise the normal private market for machine guns. So drug addicts furnish the normal outlet for morphine which gets outside the restricted channels of legitimate trade.

319 U.S. at 710–11, 63 S.Ct. at 1269. The Court explained that the difference in commodities was important in terms of both the seller's *knowledge* of the buyer's intended use, and the seller's *intent* to promote and cooperate in the illegal action:

This difference is important for two purposes. One is for making certain that the seller knows the buyer's intended illegal use. The other is to show that by the sale he intends to further, promote and cooperate in it.

*Id.* In recognition of the obvious difference between the sale of morphine and the sale of sugar, yeast and cans, the Court specifically stated that the quantum of proof required to show knowledge that the buyer will use the commodity unlawfully is dependent on the nature of the commodity:

The difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, arising from the latters' inherent capacity for harm and from the very fact they are restricted, makes a difference in the quantity of proof required to show knowledge that the buyer will utilize the article unlawfully. Additional facts, such as quantity sales, high-pressure sales methods, abnormal increases in the size of the buyer's purchases, etc., which would be wholly innocuous or not more than ground for suspicion in relation to unrestricted goods, may furnish conclusive evidence, in respect to restricted articles, that the seller knows the buyer has an illegal object and enterprise. *Knowledge, equivocal and uncertain as to one, becomes sure as to the other. So far as knowledge is the foundation of intent, the latter thereby also becomes the more secure.*

319 U.S. at 711–12, 63 S.Ct. at 1269 (emphasis added).

*Falcone* and *Direct Sales* must be viewed along a continuum of transactions. At one end of the continuum is *Falcone,* which did not involve an inherently illegal transaction at all, but rather the sale of goods "in themselves innocent." 311 U.S. at 207, 61 S.Ct. at 205 (quoting the opinion below, 109 F.2d 579, 581 (2d Cir.1940)).[5] The sale of

---

**5.** The Second Circuit has subsequently limited *Falcone* to its facts:

The defendants invoke our decision in *United States v. Falcone,* 2 Cir., 109 F.2d 579, for the proposition that a mere supplier, even one who knows of the illegal purpose of his purchaser, cannot be held as a co-conspirator. We have limited that case to its strict facts—the case of a supplier of goods, innocent in themselves, who does nothing but sell those goods to a purchaser who, to the supplier's knowledge, intends to and does use them in the furtherance of an illegal conspiracy. The suppliers here did more than just sell. They aided and abetted the conspiracy by themselves making illegal sales; for their sales were not on the basis of the proper forms or pursuant to written orders of the type required by 26 U.S.C. § 2591(a) for marihuana transfers. As these sales were illegal and clandestine, each supplier, through them, became himself a part of the conspiracy for their intended resale; this added element of personal law-breaking and clandestine selling furnished the required "stake in the success of the venture" that the Falcone case demanded.

*United States v. Tramaglino,* 197 F.2d 928, 930–31 (2d Cir.), *cert. denied,* 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952). Thus, the Second

morphine in *Direct Sales* fell somewhere in the middle of the continuum, in that it involved the sale of a restricted commodity. Thus, "not every instance of sale of restricted goods" would support a charge of conspiracy. 319 U.S. at 712, 63 S.Ct. at 1269. But the restricted nature of the commodity meant that there were limitations on the possible expansion of the legal market:

> [T]he market for opiates may [not] be developed as any other market.... Mass advertising and bargain-counter discounts are not appropriate to commodities so surrounded with restrictions. They do not create new legal demand and new classes of legitimate patrons, as they do for sugar, tobacco and other free commodities. Beyond narrow limits, the normal legal market for opiates is not capable of being extended by such methods. The primary effect is rather to create black markets for dope and to increase illegal demand and consumption.

*Id.* In the case of *Direct Sales,* the sale of large quantities of morphine, together with the prolonged cooperation between the seller and buyer, provided the evidence sufficient to convict the seller of conspiracy to violate the narcotics laws.

If *Falcone* is at one end of the continuum, Michelena-Orovio's case is at the other, for the transaction involving the marijuana was itself illegal and there was no legal market for the commodity. The absence of any legal market provides the link that supports the inference of involvement in the conspiracy to possess with intent to distribute. Michelena-Orovio would have had no job if there had been no plan made for the distribution of his cargo. The twelve tons of marijuana would have been virtually worthless if there had been no conspiracy to distribute. The marijuana could not be sold in the supermarket as sugar or yeast could, *Falcone,* nor could it be disposed of in a pharmacy or hospital, as morphine might be. *Direct Sales.*[6] Com-

mon sense leads to the conclusion that an importer of that much marijuana knows perfectly well, and indeed relies on the fact, that there is a plan for the distribution of his cargo. *See Turner v. United States,* 396 U.S. 398, 417, 90 S.Ct. 642, 653, 24 L.Ed.2d 610 (1970) ("Common sense ... tells us that those who traffic in heroin will inevitably become aware that the product they deal in is smuggled, unless they practice a studied ignorance to which they are not entitled."); *Barnes v. United States,* 412 U.S. 837, 845, 93 S.Ct. 2357, 2363, 37 L.Ed.2d 380 (1973) (affirming conviction of possession of United States Treasury checks stolen from the mails where knowledge that the checks were stolen was inferred from unexplained possession of checks made out to someone with whom the defendant was unacquainted). In the context of the importation of a huge quantity of marijuana, in contrast to the sale of a commodity that is merely restricted, it is not necessary to have an ongoing venture in order to establish involvement in the plan for distribution, because the requisite positive interest in the distribution scheme is supplied by virtue of the fact that there would be no cargo and the cargo could not be disposed of unless such a scheme existed.

The majority emphasizes that the drug chain-conspiracy cases involved multiple transactions over a considerable length of time. The discussion in those opinions of the ongoing nature of those transactions was not, however, necessarily directed to whether the supplier could be convicted of the conspiracy to distribute the narcotics that he had supplied. Proof of an ongoing conspiracy was needed to convict the defendants of participation in other transactions, separated in time, personnel, and location from those in which they had directly participated. The ongoing nature of the conspiracy supplied the rim for the spokes of the wheel, not the links in each individu-

---

Circuit has held that the defendant's participation in an illegal sale may provide the requisite stake in the venture.

**6.** While the medical community has been experimenting with marijuana in treating a number of ailments, that community can hardly be said to provide a demand for twelve tons of marijuana.

al distribution chain. The Second Circuit has recognized that the links at the far ends of a long-term chain conspiracy may be unaware of others performing roles similar to theirs, but the links of a single supply chain are inextricably related to one another:

> As applied to the long term operation of an illegal business, the common pictorial distinction between "chain" and "spoke" conspiracies can obscure as much as it clarifies. *The chain metaphor is indeed apt in that the links of a narcotics conspiracy are inextricably related to one another, from grower, through exporter and importer, to wholesaler, middleman, and retailer, each depending for his own success on the performance of all the others.* But this simple picture tends to obscure that the links at either end are likely to consist of a number of persons who may have no reason to know that others are performing a role similar to theirs—in other words the extreme links of a chain conspiracy may have elements of the spoke conspiracy. Moreover, *whatever the value of the chain concept where the problem is to trace a single operation from the start through its various phases to its successful conclusion,* it becomes confusing when, over a long period of time, certain links continue to play the same role but with new counterparts, as where importers who regard their partnership as a single continuing one, having successfully distributed one cargo through X distributing organization, turn, years later, to moving another cargo obtained from a different source through Y.

*United States v. Borelli,* 336 F.2d 376, 383–84 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965) (footnote omitted) (emphasis added); *see also Bruno,* 105 F.2d at 923.[7] Michelena-Orovio's case is one where the issue is whether the jury is entitled to infer the defendant's participation in the conspiracy to distribute the marijuana that he has supplied, not whether he is involved in a number of distribution schemes extending over time.

Similarly, the fact that Michelena-Orovio only participated in a single act does not render his participation in the distribution scheme insufficient. In *United States v. Magnano,* 543 F.2d 431 (2d Cir.1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977), the Second Circuit was confronted with and rejected a similar argument:

> For much the same reasons the fact that De Lutro and Soldano each only consummated one transaction with the core group does not render their participation insufficient to warrant their inclusion in the single conspiracy charged. The so-called single transaction rule, . . .

---

7. *Compare Elam,* 678 F.2d at 1247 (rejecting defendants' contention that they were part of a separate conspiracy to import marijuana for themselves and holding that the jury could reasonably have inferred that all defendants were involved in a single conspiracy to import twelve tons of Colombian marijuana into the United States); *Martino,* 664 F.2d at 876 (affirming convictions of participation in a single conspiracy of a number of retailers and wholesalers who had consummated a transaction with the core group); *Jabara,* 618 F.2d at 1327 (affirming convictions of participants in an extensive four-year drug conspiracy); and *United States v. Baxter,* 492 F.2d 150 (9th Cir.1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974) (affirming convictions of participants in an extensive long-term drug smuggling conspiracy and holding that there was no variance between the indictment charging a single conspiracy and the proof at trial), *with United States v. Cambindo-Valencia,* 609 F.2d 603 (2d Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980) (reversing district court decision that held that there was one conspiracy as a matter of law merely on the basis of the fact that the contraband all came from one city in Colombia on the same shipping line, that a number of the defendants knew each other, that arrangements were made at the same bar in New York, and that the transactions involved similar methods of operation); and *Borelli* (reversing convictions of and granting new trial for defendants who participated in some but not all phases of a nine-year narcotics conspiracy, during the course of which some of the principals and sources of supply had changed, and holding that the defendants were entitled to have the jury instructed to find what their particular agreements were and that these continued into the conspiracy period not barred by the applicable statute of limitations).

recognizes that a single isolated act does not, *per se,* support an inference that a defendant had knowledge of, or acquiesced in, a larger conspiratorial scheme. It is only "when there is no independent evidence tending to prove that the defendant had some knowledge of the broader conspiracy and when the single transaction is not in itself one from which such knowledge might be inferred," . . . that the single act is an insufficient predicate upon which to link the actor to the overall conspiracy. . . . Each of the "single acts" here—De Lutro's sale of five kilos pure heroin and Soldano's sale of three kilos—was to core members of the conspiracy and *of such a magnitude* as to justify "an inference that each knew he was involved in a criminal enterprise of substantial scope."

543 F.2d at 434–35 (citations omitted) (emphasis added). So, for example, where a buyer makes one purchase of a small amount of marijuana, the single purchase does not in and of itself support the inference that the buyer is part of the distribution scheme. Such a purchase could conceivably be made solely for the buyer's personal consumption. Where the single sale involves twelve tons of marijuana, however, that sale cannot possibly be limited to a purchase for the buyer's personal use. *Mazyak, supra; Mann, supra; see ,also United States v. Prieskorn,* 658 F.2d 631, 634 (8th Cir.1981) (ten to fifteen pounds of cocaine sold over a fourteen-month period). Indeed, it strains credibility to suggest that the importation of twelve tons of marijuana with an approximate street value of between four and six million dollars is a "casual" transaction, even if the transaction is planned for one time only. The majority's approach would permit the drug smuggler to make a one-time killing in the market, free from any fear of prosecution for his part in the scheme to distribute his wares.

In summary, the fact that the defendant is involved in importing a huge quantity of marijuana into the United States may establish both the defendant's knowledge of and his joinder in the conspiracy to possess with intent to distribute. Since twelve tons of marijuana is more than mere mortals could personally consume in a lifetime, *Cortez, supra,* someone must have an intent to distribute the contraband.[8] The defendant's awareness of the existence of the conspiracy flows from his participation in the conspiracy to import such a large quantity, for in the absence of any legal market in which to dispose of his wares, there is no reason to import the goods if there has been no plan made for their distribution. Similarly, the defendant's joinder or interest in the conspiracy to distribute may be inferred from his involvement in the importation scheme, for he would have no importing job if there was no conspiracy to distribute. Finally, the act of importation itself is an act in furtherance of the conspiracy to possess with intent to distribute, for there would be no distribution scheme if there were no marijuana to distribute. *See United States v. Tramaglino,* 197 F.2d 928, 930–31 (2d Cir.), *cert. denied,* 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952).

## III. THE MERE COLOMBIAN SEAMAN.

The majority maintains that the inference of Michelena-Orovio's involvement in the distribution scheme is "at war" with the facts in this case. at 506 (quoting *Fenner v. General Motors Corp.,* 657 F.2d 647, 651 (5th Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982)). This "war" is based on facts that are not even in the record. The majority paints a picture of Mr. Michelena-Orovio as a poor family man who is simply trying to earn a living by serving as a member of a crew. There is no evidence in the record that Michelena-Orovio had a family waiting for him to return to Colombia, but there is ample evi-

**8.** Michelena-Orovio does not contend that there could be no conspiracy because he was not acting in concert with other people. Accordingly, there is no need to reach the question whether the evidence would have been suffi-

cient to convict the defendant of conspiracy had he been apprehended in sole possession of the marijuana. The issue in this case was the purpose of the conspiracy, not its existence.

dence, as the majority recognizes in part IV.A of its opinion, that his means of earning a livelihood was smuggling a substantial quantity of marijuana.

The majority accepts Michelena-Orovio's argument that the absence of actual contact with the United States and his status as a "lowly non-English speaking seaman" further weakens the case against him. Michelena-Orovio's first argument concerns the fact that he, a Colombian national, was discovered on a foreign vessel on the high seas. He maintains that the evidence proved only that he was on a vessel loaded with marijuana headed for the United States, but that plans never actually called for his entry into this country. While the evidence might be sufficient to demonstrate that he knew that the vessel contained contraband and that he had joined in the conspiracy to bring it close enough to the United States for someone else to import it, he maintains that there is no evidence that he knew of or cared about the contraband's fate once it reached American shores.[9]

*Cadena* itself does not support this high seas/foreign vessel distinction. The defendants in *Cadena* were charged in the same indictment as the defendants in the companion case, *Rodriguez, supra.* In *Cadena,* we stated that "the fact that none of the appellants who were tried in this case is charged with an overt act on land merely results from the fortuity of a bifurcated trial and is not decisive." 585 F.2d at 1258 n. 7. In fact, in *Rodriguez* we reversed the convictions of conspiracy to possess with intent to distribute of two of the American defendants who had helped to arrange the importation of Cadena's cargo from within the United States because we found, as in *Cadena,* that there was insufficient evidence to demonstrate that the defendants were involved in anything more than the conspiracy to import.

Further, this distinction makes no sense in terms of the issues in this case: knowledge of and participation in the conspiracy to distribute the marijuana. Since Michelena-Orovio was properly convicted of conspiracy to import marijuana into the United States, he presumably knew the destination of the cargo.[10] We have already rejected the idea that a conspirator could escape liability on the importation count on the ground that he never actually entered United States territory. *See United States v. Ricardo,* 619 F.2d 1124 (5th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980); *see also United States v. Schmucker-Bula,* 609 F.2d 399, 402 (7th Cir.1980).[11] While a foreign national may not have the same detailed knowledge of our laws as a United States citizen might have, it would hardly be irrational for a jury to infer that Michelena-Orovio knew

---

**9.** When we affirmed the defendant's conviction in *United States v. Chaparro-Almeida,* 679 F.2d 423 (5th Cir.1982), we attempted to distinguish *Cadena* on the same ground that Michelena-Orovio urges here. We noted that Cadena's boat had been further out to sea than was the defendant's, and that "there was no supporting evidence [in *Cadena*] of any intention to deliver the contraband to the United States." 679 F.2d at 430. Michelena-Orovio has also pointed out that the boats in both *Mann, supra,* and *Mazyak, supra,* were American vessels, from which the jury could infer that the boats were planning to return home to distribute their cargo *within* the United States.

**10.** The defendant conceded at oral argument that if the jury could infer that the crew members had knowledge of the cargo in the first place, it could infer that they had knowledge that the cargo was bound for the United States.

**11.** In *Schmucker-Bula, supra,* the defendant challenged the criminal jurisdiction of the United States to convict him of conspiracy to import 100 kilograms of cocaine. He had been apprehended in the Dominican Republic, and he maintained that he was indifferent to the destination of the cocaine. He argued on the basis of *Falcone, supra,* that his activities as a seller were insufficient to make him liable as a conspirator in the importation. The Seventh Circuit rejected this argument and held that it was "sufficient that the conspirators knowingly encouraged and arranged the transportation of drugs that would end in the United States." 609 F.2d at 402 (citing *Cadena* and *Direct Sales*). The court stated further: "The sale of so large a quantity of cocaine was dependent upon the feasibility of smuggling it into the United States. Furthermore, the defendant cannot escape liability merely because the purchasers took primary responsibility for the smuggling arrangements." 609 F.2d at 402.

that the possession and distribution of marijuana in the United States is illegal. After all, both are also illegal in Colombia, and indeed, in most parts of the world. Therefore, to the extent that participation in the conspiracy to distribute may normally be inferred from participation in the conspiracy to import a large quantity of contraband, in light of the absence of a legal market for the imported goods, Michelena-Orovio's knowledge of and dependence on the existence of the distribution scheme are the same as those of his American counterpart.

The fact that some other conspirator was assigned the task of actually bringing the contraband into this country and distributing it does not mean that the defendant could not be convicted of conspiracy to possess with intent to distribute, since the government need not demonstrate any overt act on the part of the defendant to connect him to a conspiracy to violate the narcotics laws. *Rodriguez, supra; see also United States v. Davis,* 666 F.2d 195, 201 n. 9 (5th Cir.1982). Further, each conspirator is responsible for all of the acts committed in furtherance of the conspiracy that he has joined. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Diaz,* 655 F.2d 580 (5th Cir.1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982); *United States v. Hodges,* 606 F.2d 520 (5th Cir. 1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980).

I must add that to accept the defendant's proposed distinction would undercut the purposes of the narcotics laws. Both 21 U.S.C. § 846 and 21 U.S.C. § 963 were part of a congressional revision and recodification of the nation's narcotics laws "designed to deal in a comprehensive fashion with the growing menace of drug abuse in the United States." Comprehensive Drug Abuse Prevention and Control Act of 1970, H.R. Rep. No. 1444, 91st Cong., 2d Sess. (1970),

reprinted in 1970 *U.S.Code Cong. & Ad. News* 4566, 4567. In his message accompanying the proposed bill, the President stated that he wanted "successful prosecution of an increased national effort against illegal drug trafficking." *Legislation to Regulate Controlled Dangerous Substances and Amend Narcotics and Drug Laws, 1970: Hearings on H.R. 1444 Before the Subcomm. on House Ways and Means,* 91st Cong., 2d Sess. 196 (1970) (statement of Richard Nixon, President of the United States). *See also Rodriguez,* 612 F.2d at 915–17.

No one can deny that the conspiracies in this case, like many before them, had roots in a field in Colombia. In fact, a number of drug smugglers carefully avoid entering the United States in the hopes that they will avoid criminal prosecution altogether. *See, e.g., Schmucker-Bula, supra.* To hold that Michelena-Orovio cannot be implicated in the conspiracy to possess with intent to distribute would be to limit the government's ability to combat the drug trade at its source. I cannot conclude that Congress intended, or that the facts of this case warrant, such a result.

Michelena-Orovio's final argument is that the inference of participation in the distribution scheme should not be applied to him because, unlike the defendants in *Mazyak, Mann* and even *Cadena,* he was simply a lowly member of the crew. We recently rejected a similar argument in *United States v. Sockwell,* 699 F.2d 213 (5th Cir. 1983).[12] Sockwell was a member of the crew of a vessel that had been carrying 150,000 pounds of marijuana; after the marijuana was transferred to another boat, the crew burned and sank their ship. Sockwell was convicted of conspiracies to import and to possess with intent to distribute, as well as the substantive offenses of importation and possession.

---

**12.** We cited *Cadena* in *Sockwell* as analogous support for the proposition that "the '[i]ntent to distribute a controlled substance under 21 U.S.C. § 841 may be inferred solely from possession of a large amount of the substance.' "

699 F.2d at 215 (quoting *United States v. Grayson,* 625 F.2d 66 (5th Cir.1980)). Judge Rubin, who was the author of *Cadena,* was a member of the *Sockwell* panel.

On appeal, Sockwell contended that his convictions should be overturned because "he was merely a cook for the vessel's crew and did not participate in any of the activities of the vessel." *Id.* at 215. We rejected this contention and found that testimony of the other crew members, as well as circumstantial evidence, demonstrated that he was a "participating and functioning member of the conspiracy throughout." *Id.* As in Michelena-Orovio's case, Sockwell had been a member of a small crew (five men) on board a marijuana-laden boat on a lengthy voyage. *See United States v. Alfrey,* 620 F.2d 551, 556 (5th Cir.), *cert. denied,* 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980). Further, in each case all of the crew members presented a single fabricated story.

Michelena-Orovio's lowly employee argument is in essence no more than a variation on the "mere presence" argument rejected in the majority's discussion of the importation count. As the majority explains, we have held that a crew member may not be convicted of a violation of the narcotics laws solely on the basis of his presence on board a boat loaded with contraband. *United States v. Bland,* 653 F.2d 989 (5th Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981); *United States v. Willis,* 639 F.2d 1335 (5th Cir.1981). In contrast, the captain may be presumed to know the nature of his cargo. *Bland,* 653 F.2d at 996.

As was discussed in detail, however, in our disposition of the defendant's argument with regard to the importation count, more than mere presence was established in this case.[13] The jury determined that the evidence demonstrated beyond a reasonable

doubt that Michelena-Orovio was aware of and participated in the conspiracy to import a large quantity of marijuana. He was not a mere employee, but an employee aware of the nature of his business. It is well settled in this circuit that a conviction will not be reversed for lack of evidence merely because the defendant played only a minor role in the overall scheme. *United States v. Alvarez,* 625 F.2d 1196, 1198 (5th Cir.1980) (en banc) (affirming conviction of conspiracy to import marijuana of Colombian supplier's friend who intended to be present at the remote off-loading site for the marijuana).

## IV. THE AMERICAN VIEW: OTHER CIRCUITS.

Finally, I note that other circuits have permitted the jury to infer intent to distribute from the size of the cache. In *United States v. Smith,* 680 F.2d 255 (1st Cir.1982) (citing *Alfrey, supra, United States v. De-Weese,* 632 F.2d 1267, 1270, *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981), and *Cadena*), the First Circuit relied on the factors that we set forth in *Alfrey* and *DeWeese* in its affirmance of the defendant's conviction of conspiracy to possess marijuana on the high seas with intent to distribute under 21 U.S.C. §§ 963 and 955(a). The facts in *Smith* were strikingly similar to the case before us. The unregistered flagless vessel was seized on the high seas, one hundred miles off the coast of Massachusetts. On board were two Americans (one of whom was defendant Smith), ten Colombian nationals, and 263 bales of marijuana. The boat was bound for the United States from Colombia.[14] The First Circuit was unpersuaded by the defendant's

---

**13.** While some might have second thoughts about whether a defendant should be convicted of conspiracy to import solely on the basis of the factors enumerated in *Alfrey* and *DeWeese,* the sufficiency of the evidence based on those factors is the law of this circuit. *See United States v. Freeman,* 660 F.2d 1030, 1037 (5th Cir.1981) (Godbold, C.J. and Tuttle, J., concurring), *cert. denied,* — U.S. ——, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982). Further, there were other suspicious circumstances supporting the defendant's conviction in this case.

**14.** The defendant was convicted of conspiracy to possess marijuana on the high seas with intent to distribute, in violation of 21 U.S.C. § 855(a), while Michelena-Orovio was convicted of conspiracy to possess with intent to distribute in violation of 21 U.S.C. § 846. The First Circuit relied on cases interpreting § 841(a)(1), which prohibits the substantive offense of possession with intent to distribute, however, in another portion of the opinion in which it rejected the defendant's constitutional challenge to the statute on vagueness grounds.

claim that he was merely hitching a ride back home, in light of the length of the voyage, the large quantity of marijuana on board, and the necessarily close relationship between Smith and the crew.

Other circuits have followed ours in affirming convictions of persons allegedly involved in land-based conspiracies to import and to possess with intent to distribute.[15] In *United States v. Laughman,* 618 F.2d 1067 (4th Cir.), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980), the Fourth Circuit affirmed the convictions of conspiracy to possess with intent to distribute of persons involved in the transfer of over two tons of marijuana from a Colombian-type sailing vessel to vehicles waiting on land. The court stated that "the amount of marijuana involved ... sufficiently establishes that there was an intent to distribute." 618 F.2d at 1074 n. 4 (citing *United States v. Villareal,* 565 F.2d 932 (5th Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978)). In *United States v. Allen,* 675 F.2d 1373 (9th Cir.1981), the conspirators were apprehended while they were unloading boxes of marijuana from a boat that had been spotted offshore. Allen, the owner of the property where the rendezvous took place, was convicted of both conspiracy to import and conspiracy to possess with intent to distribute, and the other defendants were convicted of the second conspiracy. Affirming the convictions, the Ninth Circuit stated that the defendants' attack on the sufficiency of the evidence concerning intent to distribute was baseless: "Personal consumption of 17,000 pounds of anything, much less marijuana, is a staggering proposition sufficient to compel disbelief, leaving commercial distribution the only realistic goal of the enterprise." 675 F.2d at 1384.[16]

## V. CONCLUSION.

I would hold on the authority of a long line of precedent extending before and after *Cadena* and *Rodriguez, see, e.g., Mann, supra; Mather, supra,* that once the jury had concluded, on the basis of the factors described earlier in the majority's opinion, that the defendant was guilty of conspiracy to import marijuana, it was entitled to infer from the quantity involved that the defendant was also guilty of the conspiracy to possess with intent to distribute the marijuana.[17]

The majority objects to the fact that the *Mann* line of cases involves a "pyramiding"

---

*See also United States v. Julio-Diaz,* 678 F.2d 1031 (11th Cir.1982).

**15.** The First Circuit case is the only other case that I have discovered where the defendants were apprehended on the high seas. I suspect that this is because the states within the former Fifth Circuit are the states toward which a boat carrying South American contraband is most likely to proceed.

**16.** *See also United States v. DuFriend,* 691 F.2d 948 (10th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 820, 74 L.Ed.2d 1017 (1983) (affirming defendant's conviction of conspiracies to import 600 pounds of marijuana in a small airplane and to possess it with intent to distribute it, and holding that evidence of a large quantity of a controlled substance was relevant to intent to distribute) (citing *United States v. Palmere,* 578 F.2d 105, 108 (5th Cir.1978)); *United States v. Watkins,* 662 F.2d 1090 (4th Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1613, 71 L.Ed.2d 849 (1982) (affirming convictions of conspiracy to possess with intent to distribute of crew members observed washing marijuana residue off decks of a vessel found on the intercoastal waterways, but reversing convictions of conspiracy to import because the

government failed to demonstrate that the marijuana came from a foreign source); *United States v. Prieskorn,* 658 F.2d 631 (8th Cir.1981) (affirming convictions of conspiracy to possess cocaine with intent to distribute on the basis of the large quantity and extended period of time involved); *but see United States v. Boone,* 641 F.2d 609, 611–12 (8th Cir.1981) (citing *Direct Sales, supra,* and *United States v. Rojas,* 537 F.2d 216, 222 (5th Cir.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977) for the proposition that "the jury is entitled to consider the size of the transaction in its determination of whether a scheme to distribute the drugs existed," but expressing doubts "that any one of these factors alone would be sufficient to permit a jury to find Boone guilty of a conspiracy to distribute illegal drugs.").

**17.** This holding would not mean that a violation of 21 U.S.C. § 963 would automatically entail a violation of 21 U.S.C. § 846 or vice-versa. A person could conceivably be guilty of one conspiracy without being guilty of the other. For example, if crew member A had a small amount of marijuana that he did not wish to leave on board the ship when he visited the United States, and if he convinced crew mem-

of inferences. We have recognized, however, that "a jury may properly reconstruct a series of events by drawing an inference upon an inference," *Fenner, supra*, 657 F.2d at 650, as long as "[t]he inference relied upon is reasonable." *Id.* at 651. I cannot say that the jury was unreasonable in concluding that a man, who was found on a vessel bound for the United States from Colombia, was guilty of conspiracies to import and to possess marijuana with intent to distribute it when that same vessel was laden with twelve tons of marijuana but no fish, when the vessel attempted to disguise the direction in which it was heading and fled from United States customs agents, and when the crew all told the agents the same unlikely story that the vessel had no captain. Accordingly, I would hold that the jury's conviction of Michelena-Orovio of conspiracy to possess marijuana with intent to distribute it should be affirmed.

---

ber B to create a distraction while A went through the customs inspection, both might be convicted of conspiracy to import, but the small quantity of contraband would not give rise to the inference that they had any plan for its distribution. Similarly, if A and B decided to grow two tons of marijuana on their Louisiana farm, or if C were selling large quantities of marijuana on his college campus, neither the college drug dealer nor the farmers would necessarily be involved in any importation scheme.

*Turner, supra.* Conviction of both conspiracies would be conceivable only where a large quantity of marijuana had arrived from a foreign source. Of course, the jury could convict the defendant of one conspiracy while acquitting him of the other, since the size of the cache merely *supports* the inference of involvement. The jury is free to reject the inference. *See United States v. Ocanas*, 628 F.2d 353 (5th Cir.1980), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981).